HUGHES AIRCRAFT CO. et al., Plaintiffs-Appellants Cross-Appellees,

v.

MESSERSCHMITT–BOELKOW–BLOHM, GmbH, Defendant-Appellee Cross-Appellant.

No. 78–1263.

United States Court of Appeals, Fifth Circuit.

Sept. 8, 1980.

Dugald S. McDougall, Keith V. Rockey, Chicago, Ill., Leon H. Handley, James E. Glatt, Jr., Orlando, Fla., John A. Sarjeant, Los Angles, Cal., for plaintiffs-appellants cross-appellees.

Robert W. Duckworth, Orlando, Fla., Toren, McGeady & Stanger, David Toren, Gerald H. Kiel, New York City, for defendant-appellee cross-appellant.

Before CHARLES CLARK, RONEY and HENDERSON, Circuit Judges.

RONEY, Circuit Judge:

The issue in this case is whether certain patents were "used . . . by or for the United States," within the meaning of 28 U.S.C.A. § 1498(a), so that the Court of Claims has exclusive jurisdiction to hear this patent infringement suit. The district court held on summary judgment that the Court of Claims, not a district court, has jurisdiction to entertain the action. 437 F.Supp. 75 (M.D. Fla. 1977). We affirm.

Defendant Messerschmitt-Boelkow-Blohm, GmbH, a German firm, had undertaken to build for the Federal Republic of Germany two space vehicles, dubbed "Helios," which were designed to orbit the sun for scientific exploration. The vehicles were to be launched from Cape Canaveral, Florida, in accordance with a written agreement between the German Government and the United States. The two patents in suit, Williams Patent No. 3,758,051 and McLean Reissue No. 26,887, covered a system for controlling spin-stabilized spacecraft. Plaintiff Hughes Aircraft Co., holder of the patents, alleges the space vehicles manufactured by defendant infringed the patents.

Considering the facts in the light most favorable to Hughes Aircraft, the party opposing the motion for summary judgment, we hold the district court correctly determined that Helios was a joint research project of the United States and Germany. In its role as a partner in that project, the United States "used" the satellite for its own benefit. Accordingly, the district court is without jurisdiction over this cause, and plaintiff is limited to an action against the United States in the Court of Claims. On this basis, we affirm the summary judgment for defendant. At the same time, we affirm the district court's denial of attorney fees to defendant on its cross-appeal because we conclude plaintiff was arguably in good faith in asserting district court jurisdiction.

The determinative facts on this appeal are undisputed. As noted by the district court, the Helios project traces its origins to a 1966 meeting between President Lyndon Johnson and Chancellor Ludwig Erhardt. The two heads of state confirmed an offer extended by the National Aeronautics and Space Administration (NASA) "to launch space experiments of scientists of other nations."

During the project's nascent stages, NASA asked the German space officials to select one of two attitude control systems. A June 1969 agreement between NASA and the German authorities stated the primary objective of the Helios project was to investigate interplanetary space "in the direction of and close to the sun." That agreement further stated the project would "provide German and U.S. experimenters the opportunity of designing and flying a well-inte-

grated set of experiments aimed at specific investigations of the properties and processes in interplanetary space." A secondary objective noted by the district court was to enhance the technological expertise of German industry.

Two separate Helios missions were contemplated, with a total cost of about $260-million. The German share of the expenses was to be approximately $180-million, with the United States to provide the balance, or $80-million. Under the agreement, the German Government would "[d]esign, fabricate and test all spacecraft" and would integrate the seven German and three American experiments into the vehicle. In connection with ten experiments to be conducted by each spacecraft, one of the mission documents observed,

> While the scientific results from each experiment will provide valuable data individually, the selected experiments in their entirety will complement and supplement each other. Thus the planned combination of the US and German experiments will allow a more complete understanding of the phenomena being investigated by the spacecraft as a whole.

The German Government was also designated to test the entire spacecraft system. NASA, as noted by the district court, launched the spacecraft and provided the launch rocket. During the early phases of the mission NASA provided tracking and data acquisition support, although a team of German scientists carried out actual control responsibilities throughout the mission. A NASA press release issued just prior to the launch of the first Helios spacecraft in 1974 observed that "overall mission control is a German responsibility."

After considering voluminous scientific literature and various statements from both sides of the dispute, the district court concluded,

> From its inception the project has been termed a cooperative effort between the United States and Germany. Although an express purpose of the project was to substantially increase and demonstrate the space technological capability of Ger-

many, the [agreement between the two nations] emphasizes that the project is for the mutual benefit of both countries. 437 F.Supp. at 77.

The controlling statute is this case in 28 U.S.C.A. § 1498(a). It provides, in pertinent part,

> Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof of lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the Court of Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

> For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States.

In deciding whether the spacecraft control systems here were "used or manufactured by or for the United States" we are guided by two contrasting Court of Claims decisions, *Hughes Aircraft Co. v. United States*, 534 F.2d 889 (Ct.Cl. 1976), which found Court of Claims jurisdiction, and *Carrier Corp. v. United States*, 534 F.2d 244 (Ct.Cl. 1976), which did not.

*Hughes Aircraft Co. v. United States*, upon which the district court in this case relied, involved a joint undertaking by the United States and the United Kingdom, known as the Skynet project. In that case, the United States participated in the establishment of a satellite communication system to link British military installations. Under a 1970 agreement, the British Government was to procure its satellites from a British prime contractor who would be permitted to make use of American subcontractors with the approval of the United States. The United States agreed to grant Britain and its contractors the use of tech-

nical information, design rights, patent rights and licenses held by the United States Government, and to assist the British in obtaining additional rights where necessary.

The British were to pay all costs of the Skynet project. Costs incurred by the United States on behalf of the United Kingdom were to be paid from a trust fund consisting of sums deposited by the British. Charges were based upon work performed in connection with the launch vehicles and services, the satellites, packing and transportation, and administrative services.

In the Skynet program, the United States was to assist the British in the design, development, procurement, launch and initial orbital support of the satellites, along with the modification of a British tracking station in England. NASA's direct involvement in the Skynet project was limited to the time period from checkout and mating of the satellite to the Delta launch vehicle on the ground, to the time that the satellite separated from the launch vehicle while in a "transfer orbit." At that point, the United States Air Force was to initiate complete control over tracking and command of the vehicle for the purpose of placing it in a final orbit. In sum, NASA or the Air Force, in the case of the first of two contemplated vehicles, had complete control for the first 39 days of the mission. Thereupon, all control responsibilities were to be fully undertaken by British scientists.

The Court of Claims concluded jurisdiction was properly asserted under section 1498(a), both because the satellites were manufactured for the benefit of the United States, and because they were used by the United States.

Defendant's affidavits and exhibits show that Skynet II was intended by the U.S. and U.K. Governments to be a cooperative program, vital to the military defense and security of both countries, . .

. . . . .

Clear evidence that Skynet II, consistent with similar defense programs, was undertaken for the direct benefit of the U.S. is found, . . .

*Hughes Aircraft Co. v. United States*, 534 F.2d at 898. The Court of Claims also considered a statement by the United States Air Force in weighing the extent of American involvement in the Skynet project:

"[I]t can be seen that the US involvement in the Skynet II program cannot be viewed as a mere sale of satellite launch services by an uninterested party. Rather, the furnishing of the launch equipment and services was directly related to US National Security as an integral step toward expanding the US defense satellite communications system via the shared use cooperative program set forth in the [agreement between the United States and Great Britain] . . . ."

534 F.2d at 898.

There are certain factual distinctions between Skynet and this case. Tending to make this case stronger than Skynet for a finding of use by the United States is the fact that the United States had expended about $80-million in furtherance of the project, at least part of that being allocated to three American experiments to be conducted aboard the spacecraft. In Skynet the British financed the entire project. Furthermore, the Skynet space vehicle was a British-built unit. In the present case, American components, including the three experiments, have been integrated into the spacecraft system.

In the Skynet project, on the other hand, NASA and the United States Air Force retained complete control of the spacecraft for more than five weeks. Here German scientists assumed immediate control of the Helios craft after launch from Cape Canaveral. Although NASA ground stations still participated in Helios tracking and data acquisition, primary responsibility was relinquished to German stations. These facts make this case weaker for a finding of United States use.

But, regardless of the differences, the key to the Skynet decision, which strongly supports the denial of district court jurisdic-

tion in this case, is that the project was a shared project for the mutual benefit of both countries, with interrelated responsibilities for each. Although Skynet was a military defense and security project, this fact underscored the United States' involvement, and did not furnish the rationale for the decision.

In *Carrier Corp. v. United States*, 534 F.2d 244 (Ct.Cl. 1976), the Court of Claims again faced a patent infringement claim, where a United States Air Force base contracted with a private firm for refuse collection. Under the contract, the firm was required to furnish and install refuse compacters and containers of specified sizes and at certain locations throughout the base, and to remove at regular intervals all refuse collected in the containers. Carrier Corp., holder of certain patents covering refuse compacters and detachable containers, alleged jurisdiction under section 1498(a). The Court of Claims, in denying jurisdiction, reasoned that because the devices were useful only in connection with the contractor's duty to pick up the refuse at regular intervals, but were detached from the function performed by the Government at the air base, any use of the devices was by the contractor and not by the Government. 534 F.2d at 247. Under the facts of that case, the Government was interested only in ensuring that the containers be placed at strategic intervals throughout the base, so that its employees could easily dispose of the refuse. After that, the contractor assumed full responsibility for removing the waste, and the manner in which this would be accomplished was left completely to the contractor's expertise.

The salient facts of *Carrier Corp. v. United States* stand in contrast to those in the present case. The Court of Claims declined to find use by the United States apparently because the contractor had been hired to use its own equipment to haul the refuse from the base. The Government had no shared responsibility. The contractor's alleged use of the patented invention was without direct participation by the Government, and had no meaningful relationship to the Government's activity within the scope of the relevant contract.

In the present case, on the other hand, NASA participated directly in all phases of the Helios space project. The attitude control system that sparked this litigation was an integral part of the spacecraft.

■ Considering these authorities, we conclude the district court was correct in deciding there was "use" by or for the United States of the Helios spacecraft systems sufficient to vest exclusive jurisdiction for plaintiff's patent infringement claims in the Court of Claims. This decision is based upon facts about which there is no genuine issue. We do not suggest that any one aspect of American involvement in this project would be sufficient, standing alone, to constitute use by the United States under the statute. Examining the project as a whole, however, the district court correctly concluded that the Helios project was a joint effort, wherein the two partners participated fully in planning and carrying out nearly all aspects of the mission, for mutual benefit. The United States was to conduct three experiments aboard the vehicles; met a substantial portion of the project's costs; took responsibility for initial technical coordination for the project; and launched the vehicle. The United States was not just a passenger aboard a German spacecraft, as argued by the plaintiffs. The allegedly infringing control system, even though selected for use by the German Government, nevertheless was an integral portion of the spacecraft, and was used by the join project as a whole.

Defendant asserts the district court abused its discretion in denying attorney fees under 35 U.S.C.A. § 285. That section provides, "The court in exceptional cases may award reasonable attorney fees to the prevailing party." Defendant asserted as exceptional circumstances that (a) Hughes acted in bad faith by instituting this action in the district court when Hughes knew the district court had no jurisdiction; and (b) following the Skynet decision maintenance of the action and aggressive opposition to the motion for summary judgment was to-

tally unreasonable and in the nature of harassment, causing defendant great expense.

This Court has previously held that

The law placing, as it does, the discretion in the trial court to determine . . . whether the case is an exceptional one so that attorneys' fees should be allowed, appellate courts ought not to and will not interfere with the exercise of such discretion. Indeed, they may not do so unless there is such a clear abuse as to show that discretion was not exercised, or unless it is plain that the trial court's decision is based on an erroneous concept of law.

*Graham v. Jeoffroy Manufacturing, Inc.*, 253 F.2d 72, 78 (5th Cir.), *cert. denied*, 358 U.S. 817, 79 S.Ct. 28, 3 L.Ed.2d 59 (1958); *see Williamson-Dickie Manufacturing Co. v. Hortex, Inc.*, 504 F.2d 983, 988–89 (5th Cir. 1974).

The district court in denying attorney fees here said:

I have to conclude that the point that plaintiffs took was arguably in good faith. The statute was not so clear that it couldn't be argued in their behalf, and as they say, they were operating on the *Carrier* case as well.

So I don't feel like I can conclude that an attorney fee should be awarded.

We cannot conclude that the district court abused its discretion. The jurisdiction issue asserted by plaintiffs was arguable. The fact that the district court and this Court decided to the contrary does not mean that the points made were so clearly meritless as to require a finding that they were made in bad faith. The precedents were not so controlling as to make the prosecution of the case frivolous.

AFFIRMED.