HUGHES AIRCRAFT
COMPANY, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 426–73.

United States Claims Court.

Sept. 29, 1988.

Sheldon Karon, Victor G. Savikas, Lawrence A. Wojcik, Sharon R. Barner, Chicago, Ill., for plaintiff.

Thomas J. Byrnes, with whom were Asst. Atty. Gen. Richard K. Willard and Vito J. DiPietro, Washington, D.C., for defendant. David M. Schlitz and Joan E. Hartman, Dept. of Justice, Washington, D.C., of counsel.

## OPINION

TURNER, Judge.

Hughes Aircraft Company, owner of U.S. Patent No. 3,758,051 (the Williams patent),[1]

---

1. The Williams patent deals with an attitude control system for spin-stabilized spacecraft

claims entitlement to compensation pursuant to 28 U.S.C. § 1498 by reason of the government's alleged use of the patent in 108 spacecraft. Hughes seeks damages in excess of three billion dollars.

Hughes filed its complaint in 1973; since then a lengthy, complex and costly litigation has ensued at trial and appellate levels.[2] In 1983, the United States Court of Appeals for the Federal Circuit held that the Williams patent was valid and infringed by 27 spacecraft and remanded the case to this court for a determination of damages owed to Hughes. *Hughes Aircraft Co. v. United States,* 717 F.2d 1351 (Fed.Cir. 1983). Trial of the current phase of the litigation, involving a determination of damages for uses already adjudged to constitute infringement and a determination of liability and damages concerning Hughes' newer, additional allegations of infringement, began on February 2, 1988.

On January 15, 1988, defendant filed a motion for partial summary judgment with respect to all claims made in connection with 13 specific spacecraft[3] which were manufactured for the United States by Ford Aerospace & Communications Corp. or its predecessor Philco–Ford Corp. (herein collectively "Ford") and which allegedly utilized the Williams invention.[4] Defendant contends that a 1987 agreement between Hughes and Ford released the United States from any liability for infringement of the Williams patent by Ford-manufactured spacecraft.

This opinion addresses the motion for partial summary judgment and supplements the decision rendered from the bench on June 16, 1988 (trial transcript, pp. 6464–79) and paragraph 1 of an order entered June 22, 1988 memorializing the decision.

## I

In September 1976, a contract was executed between Ford and the International Telecommunications Satellite Organization ("Intelsat")[5] for the procurement and launch of several commercial satellites referred to as the Intelsat V satellites.[6] The

which was first used in the early 1960's in the communications satellites SYNCOM II and SYNCOM III. The patent was issued to Hughes on September 11, 1973 as assignee of inventor and former Hughes employee Donald D. Williams.

**2.** Previous published opinions in this case include:
  a. 15 Cl.Ct. 267 (1988);
  b. 717 F.2d 1351 (Fed.Cir.1983);
  c. 215 U.S.P.Q. 787 (Ct.Cl. Trial Div. 1982);
  d. 226 Ct.Cl. 1, 640 F.2d 1193 (1980);
  e. 205 U.S.P.Q. 381 (Ct.Cl. Trial Div. 1979);
  f. 197 U.S.P.Q. 797 (Ct.Cl.1977);
  g. 197 U.S.P.Q. 791 (Ct.Cl. Trial Div. 1977);
  h. 209 Ct.Cl. 446, 534 F.2d 889 (1976).
  Published opinions pertaining to the Williams invention preceding issuance of the patent include:
  a. *Williams v. NASA,* 463 F.2d 1391, 59 CCPA 1329 (1972), *cert. denied,* 412 U.S. 950, 93 S.Ct. 3013, 37 L.Ed.2d 1003 (1973);
  b. *Williams v. NASA,* 423 F.2d 1253, 57 CCPA 1017, (1970).
  A published opinion in other litigation involving the Williams patent and having some bearing on issues in this case is *Hughes Aircraft Co. v. Messerschmitt–Boelkow–Blohm,* 625 F.2d 580 (5th Cir.1980).
  Further, *Messerschmitt–Boelkow–Blohm v. Hughes Aircraft Co.,* Civ. No. J–79–2236 (D.Md.) is a case in which plaintiff counterclaimed directly against a manufacturer of several satellites, including Helios B involved in this case, claiming infringement of the Williams patent.

**3.** GOES B, GOES C, NATO II A, NATO II B, NATO III A, NATO III B, NATO III C, NATO III D, SKYNET II A, SKYNET II B, SMS A, SMS B, SMS C (GOES A).

**4.** Indeed, the United States has been adjudicated a user of the patent in four of the 13 spacecraft, to wit., NATO II A and B and SKYNET II A and B. *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1352 (Fed.Cir.1983).

**5.** Intelsat is an international consortium of over 100 countries that acquires, launches and uses communications satellites for the benefit of member nations. The United States participates in Intelsat through Comsat, a federally chartered corporation that is entirely privately owned. The Intelsat V satellites were procured by non-governmental entities and thus are not involved in the instant action.

**6.** The Intelsat V contract provided for the manufacture and delivery of seven flight spacecraft and an option for eight additional spacecraft. Intelsat exercised its option, and fifteen satellites were delivered to Intelsat. Thirteen Intelsat V satellites were launched from December 6, 1980 through May 30, 1986. Two Intelsat V satellites have yet to be launched.

**552**

Communications Satellite Corporation ("Comsat") was the manager of Intelsat until 1979 and in that capacity negotiated the Intelsat V contract with Ford.

As part of the Intelsat V contract, Ford agreed to indemnify Intelsat and Comsat against any patent infringement claims based upon the Williams patent and to resist or defend at its own expense any claim for equitable relief or damages.

On November 15, 1985, Hughes filed three separate actions involving infringement of the Williams patent in the procurement and launch of the Intelsat V satellites.[7]

Comsat, Intelsat and Ford filed answers contesting validity and denying infringement. Because Ford had agreed to indemnify and defend Intelsat/Comsat against claims of infringement of the Williams patent, Ford was the real party in interest in all three cases.

Ford filed a separate action against Hughes alleging infringement by Hughes of two patents owned by Ford.[8]

## II

In an attempt to settle all outstanding disputes on the patents at issue, Hughes and Ford conducted negotiations which included, on August 19, 1987, a presentation by counsel to a delegation of several high level Ford and Hughes officials. Included in Hughes remarks at the presentation was a discussion of this suit against the government. Pl.App.,[9] Tab 7 (deposition of K.L. Zerschling), pp. 91–93.

On September 10, 1987, the parties executed a final settlement agreement. The full text of the settlement agreement, and especially the amount paid by Ford pursuant to its terms, are shielded from public disclosure by a protective order issued by this court on December 3, 1974. Only portions of the agreement necessary to a resolution of the instant motion, and which the parties to this litigation agree may be publicly discussed without alteration of the protective order, were revealed at the June 16, 1988 hearing or will be set forth in this opinion.

In general terms, the settlement agreement recited that Hughes and Ford were desirous of settling the then pending litigation between themselves and provided mutual licenses pertaining to certain patents and mutual releases pertaining to the same patents. Further, the agreement provided for payment to Hughes by Ford of an amount which, though shielded from public disclosure, may fairly be characterized as highly significant even to large corporations in the aerospace industry. The amount of the agreed payment by Ford was certainly vastly more than nuisance value and far more than a mere formal or token acknowledgment by Ford that it had employed the Williams patent.

The specific portions of the agreement having a direct bearing on the instant motion are the license and the release granted by Hughes. Section 2(a) of the agreement (license grant) provides in pertinent part:

Hughes hereby grants to Ford ... a fully paid-up non-exclusive, irrevocable license under the Williams Patent, which license includes, without limitation, the right to make, have made, lease, use, and/or sell devices covered by one or more claims thereof, and/or to practice and have practiced claimed methods or processes. The license granted hereunder shall extend to all customers for and users of devices made or sold by Ford

7. *Hughes Aircraft Co. v. Ford Aerospace & Communications Corp.*, No. 85–666 (D.Del. filed Nov. 15, 1985); *Hughes Aircraft Co. v. International Telecommunications Satellite Organization*, No. 85–3658 (D.D.C. filed Nov. 15, 1985); *Hughes Aircraft Co. v. Communications Satellite Corp.*, No. 85–3660 (D.D.C. filed Nov. 15, 1985). In May, 1986, the cases were consolidated in the United States District Court for the District of Columbia, as *In re Williams Patent Litigation*, MDL No. 688, Misc. No. 86–0127.

8. *Ford Aerospace and Communications Corp. v. Hughes Aircraft Company*, No. 87–413 (D.Del. filed July 31, 1987).

9. References in this form are to Appendix to Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment filed April 6, 1988.

... with respect to the use and sale of said devices made or sold by Ford....

Section 3(a) of the agreement (release) further provides in pertinent part:

> Hughes hereby irrevocably grants to Ford ... a release from any and all claims of infringement of the Williams Patent, which claims have been made or might have been made or might be made at any time. *Such releases shall extend to all customers for and users of goods made or sold by Ford ... with respect to the use and sale of said goods made or sold by Ford....* [Emphasis added.]

It is this release provision of the settlement agreement which gives rise to the government's motion. In sum, defendant asserts that even if it would otherwise be liable under 28 U.S.C. § 1498(a) for use of the patent in connection with the 13 Ford-built satellites, plaintiff has released users of Ford products from "any and all claims of infringement."

## III

Summary disposition requires that no genuine dispute exist as to any material fact and that the moving party be entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Mingus Constructors, Inc. v. United States*, 812 F.2d 1387 (Fed.Cir.1987). The evidence of the nonmovant is taken as true and "all justifiable inferences are to be drawn in his favor." *Alliance Oil & Refinery Co. v. United States*, 13 Cl.Ct. 496, 499 (1987). Finally, all doubts as to material fact issues are resolved against the moving party. *South Louisiana Grain Services v. United States*, 1 Cl.Ct. 281, 289 (1982).

## IV

Defendant's motion is grounded on the language of the release provision of the Hughes–Ford settlement agreement. The motion can be decided as a matter of law by construing the release in the context of existing law and by giving the language employed its natural and ordinary meaning. With no material facts in dispute, the matter is properly before the court for disposition on motion for partial summary judgment.

## V

The construction and enforcement of a release or settlement agreement are governed by general principles of contract law. Contract interpretation is a matter of law. *Dynamics Corp. of America v. United States*, 182 Ct.Cl. 62, 389 F.2d 424 (1968). "[I]n the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intent of the parties." S. Williston, Law of Contracts § 601 (3d Ed. 1961). In attempting to give effect to the contracting parties' intent, the court is guided by the principle that "[t]he parties' intent must be gathered from the instrument as a whole." *ITT Artic Services, Inc. v. United States*, 207 Ct.Cl. 743, 751, 524 F.2d 680, 684 (1975) citing *Kenneth Reed Constr. Corp. v. United States*, 201 Ct.Cl. 282, 288, 475 F.2d 583, 586 (1973).

The general rule is that extrinsic evidence will not be received to change the terms of a contract that is clear on its face. *SCM Corp. v. United States*, 230 Ct.Cl. 199, 675 F.2d 280, 284 (1982). Where the language itself is clear, the fact that the parties later disagree as to the scope of the agreement has no effect on this rule. *Perry & Wallis, Inc. v. United States*, 192 Ct.Cl. 310, 315, 427 F.2d 722, 725 (1970); the subjective and unmanifested intention of the releasing party cannot avoid the effect of an unambiguous release. *H.L.C. Construction Co. v. United States*, 176 Ct.Cl. 285, 295, 367 F.2d 586, 592 (1966).

Finally, a court should ascribe to contract language "its ordinary and commonly accepted meaning," *Hol–Gar Manufacturing Corp. v. U.S.*, 169 Ct.Cl. 384, 390, 351 F.2d 972 (1965), without twisted or strained analysis. *Aero Mayflower Transit Co. v. United States*, 162 Ct.Cl. 233 (1963).

As a general proposition, releases are presumed to be valid, *Grand Motors, Inc. v. Ford Motor Co.*, 564 F.Supp. 34, 38 (W.D.Mo.1982), and are to be accorded finality by the courts. *Doganieri v. United*

*States,* 520 F.Supp. 1093, 1098 (N.D.W.Va. 1981). Releases are properly given effect through grants of summary judgment. *Ingram Corp. v. J. Ray McDermott & Co.,* 698 F.2d 1295, 1323 (5th Cir.1983); *Grand Motors,* 564 F.Supp. at 38. Where the words of a release are not ambiguous, the construction of the agreement is a question of law for the court. *Weingart v. Allen & O'Hara, Inc.,* 654 F.2d 1096, 1103 (5th Cir. Unit B 1981). In construing the agreement, the court must look to the intent of the parties as expressed in the document itself. *Weingart v. Allen & O'Hara, Inc.,* 654 F.2d at 1103. Clear language negotiated by "commercial parties with substantially equal bargaining power" and represented by counsel should be construed to mean what it says. *Ingram Corp.,* 698 F.2d at 1312.

## VI

In accord with the forgoing principles, it is plain that the agreement released Ford from all claims in connection with the manufacture of spacecraft employing the Williams invention and that it released all customers of Ford and users of Ford-built products which employed the Williams invention. Equally clear is that defendant was such a customer and user encompassed within the release language.

■ The release executed by Hughes specifically creates a category of third party beneficiaries to the contract of release, to wit., "all customers" of Ford and "all users" of Ford-manufactured goods. Releases for customers of an infringing party and/or users of its products are common in patent litigation and are to be given full effect. *See, e.g., Aro Mfg. Co. v. Convertible Top Replacement,* 377 U.S. 476, 493–97, 84 S.Ct. 1526, 1535–38, 12 L.Ed.2d 457 (1964); *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 813, 65 S.Ct. 993, 996–97, 89 L.Ed. 1381 (1945). Indeed, this type of release

has been described as a "standard form of release." *Broadview Chem. Corp. v. Loctite Corp.,* 406 F.2d 538, 541 (2d Cir.1969).

In general, releases extending to "all other persons" are frequently used and are commonly given effect by way of summary judgment to third parties not specifically named in the release. *See Douglas v. United States Tobacco Co.,* 670 F.2d 791 (8th Cir.1982) (release in medical malpractice action as to "all other persons" bars later suit against tobacco company). This applies even if the cause of action against the third party is unrelated to that against defendant in the first action, *see e.g., Stefan v. Chrysler Corp.,* 472 F.Supp. 262, 263 (D.Md.1979), *aff'd w.o. opinion,* 622 F.2d 587 (4th Cir.1980), and even if the releasor was ignorant of the precise identity of the parties released at the time of its execution, *Dorenzo v. General Motors, Corp.,* 334 F.Supp. 1155, 1157 (E.D.Pa. 1971).

Phrases such as "all customers" and "all users" could hardly be more clear cut and categorical. " '[A]ll' means 'all' without requiring the insertion of the names of any and all other persons." *Morison v. General Motors Corp.,* 428 F.2d 952, 953 (5th Cir.), *cert. denied,* 400 U.S. 904, 91 S.Ct. 142, 27 L.Ed.2d 141 (1970). To read implied limitations into the release would require contortion of the release language.

■ To support an argument that "all" means less than all, plaintiff asserts that the preamble, providing that the parties were settling specific litigation, limits the release contract by implication.[10] However, a narrowing of the release by implication would require the court either to rewrite the release or to ignore it completely.[11] The plain, unequivocal language of the release indicates that the parties settled much more than the claims at issue in the litigation between Hughes and Ford. The release extends to parties other than Ford

---

10. If the parties to the release had intended this limitation, an agreement to dismiss the litigation with prejudice would have been sufficient.

11. Hughes, drafter of the settlement agreement, could have avoided the current dispute merely

by inserting "except the United States" after the language releasing Ford customers and users of Ford products. Hughes was actively pursuing discovery in this case at the time it drafted the settlement agreement.

and Hughes by encompassing Ford customers and users of Ford products, and to claims other than those at issue in the litigation by encompassing any claims that "might have been made" in the past or any claims that "might be made" at any time in the future.

The release language is susceptible of only one reasonable interpretation: Hughes intended to release Ford users and customers from infringement claims regarding the Williams patent.

■ It is found that the United States is either a "customer" or a "user," within the meaning of the release executed by plaintiff, with respect to the 13 Ford-built satellites that are alleged by plaintiff to infringe the Williams patent. As to the 11 spacecraft at issue in this litigation that were purchased by the United States directly from Ford, the United States was plainly a "customer" of Ford. As to two spacecraft incorporating devices manufactured by Ford but not sold to the United States, Skynet II A & B, there has already been a determination by this court that the defendant is a "user." *Hughes Aircraft Co. v. United States*, 209 Ct.Cl. 446, 534 F.2d 889 (1976). Accordingly, as to these 13 spacecraft, defendant has been released by Hughes from "any and all" liability for use of plaintiffs' patent.

## VII

■ Furthermore, given the foregoing interpretation of the release agreement, *W. Vinten Ltd. v. United States*, 213 Ct.Cl. 759 (1977), puts the matter to rest. Presented with a similar release provision, the Court of Claims held that in releasing its claim against a third party contractor, a patentee had also released its right to recover for such infringement from the government under 28 U.S.C. § 1498. Thus, Hughes' claims against the government are barred as a matter of law because under 28 U.S.C. § 1498 the government stands in Ford's place and is entitled to all defenses available to Ford, including that of release. *W. Vinten Ltd.*, 213 Ct.Cl. at 761.

## VIII

Plaintiff's principal argument in opposition to defendant's motion is that the critical language ("Hughes hereby irrevocably grants to Ford ... a release from any and all claims of infringement of the Williams Patent, which claims ... have been made or might have been made or might be made at any time") could not have been intended to and should not be construed to include claims with respect to products which Ford had made for the United States. With that predicate, Hughes then argues that the extension of "such releases" to all Ford customers and users of Ford products could not properly be construed to include the United States.

Plaintiffs assert as a legal basis for its position that under 28 U.S.C. § 1498(a), a claim for use of a patent in a product made for the United States may be properly asserted only against the United States and may never successfully be asserted by a patentee directly against a government contractor.[12] While plaintiff's construction of § 1498, in its present form, is sound, the argument has several weaknesses.

■ First, the language of the release, without equivocation or reservation of any kind, and in the broadest possible terms, grants a release "from any and all claims of infringement ... which claims have been made or might have been made or might be made at any time." Plaintiff's attempt to construe this broad, unequivocal, all encompassing language of the release in a narrow, hypertechnical, legalistic fashion, is contrary to the legal principles set forth above which control construction of releas-

---

12. To the extent that plaintiff may be suggesting that in a contract with Ford it cannot, as a matter of law, release its § 1498 claims against the government, any such suggestion would be erroneous. Such claims may freely be released in a contract between a patent holder and the government contractor. *See Dynamics Corp. of Am. v. United States*, 5 Cl.Ct. 591, 609–10 (1984), *aff'd in part, rev'd on other grounds in part,* 766

es.[13]

Second, the "claims" designated in the release are, in context, those which Hughes might possibly assert, regardless of their validity or legal deficiency. Thus, the literal language of the release is not limited to claims which might properly be made and which will likely be successful but rather include "any and all claims" which might be asserted at any time.

The history of this very case furnishes examples of collateral litigation in other courts where Hughes made claims directly against the manufacturer with respect to satellites for which there was actual or potential liability of the United State under § 1498(a). See *Hughes Aircraft Co. v. Messerschmitt–Boelkow–Blohm,* 625 F.2d 580 (5th Cir.1980), and the pleadings and dispositive motions in *Messerschmitt–Boelkow–Blohm v. Hughes Aircraft Co.,* Civ. No. J–79–2236 (D.Md.).[14]

Third, the logical extension of plaintiff's argument results in an absurdity. Hughes counsel candidly stated in argument that under plaintiff's current interpretation of the release, if Ford were liable under a patent indemnity agreement with the United States (as it unquestionably would bé if NATO III D were found to infringe and possibly would be with respect to SKYNET II A and B, already found to infringe), then, in spite of the broad release language, Ford would still be liable to indemnify the United States. Trial transcript, p. 6446. Yet counsel acknowledges that matching language of the license agreement in the section preceding the release includes the United States with respect to uses after the settlement agreement was executed. Trial transcript, p. 6451. See also Pl.App., Tab 8 (deposition of A.W.

Karambelas), p. 21, 27–28. Thus, plaintiff's position not only flies in the face of plain language which it drafted, but would achieve differing results from identical language in matching provisions of the agreement.

Fourth, the Hughes interpretation of the critical release language is contrary to the reasonable understanding of Ford, the other party to the release. At the time of settlement negotiations, Ford was concerned about potential liability for indemnity which the defendant might assert over satellites sold by Ford to the government. Pl.App., Tab 7 (deposition of K.L. Zerschling), pp. 56–57, 95–96, 119–20, 145, 148–50. Ford understood that the settlement would release it from any possible liability of any kind which it might have with respect to the Williams patent. *Id.,* pp. 95–96, 145. Both parties to the agreement were aware of this Claims Court litigation involving the Williams invention when they adopted the release's broad, unrestricted language. Pl. App., Tab 8 (deposition of A.W. Karambelas), p. 69. The settlement agreement was signed in September 1987 when this case was very active.

Plaintiff asserts that Ford's failure to carry any contingent liability figure on its current balance sheets is an indication that Ford did not consider itself potentially liable for government purchased spacecraft. But, regardless of whether Ford considered a possible government claim serious enough to place on the balance sheet, there existed a potential for litigation. The parties concur that by express contract, Ford was potentially liable to defendant with respect to NATO III D. See also Pl.App., Tab 7 (deposition of K.W. Zerschling), pp. 119–20. Additionally, the so-called *"Chris-*

---

F.2d 518 (Fed.Cir.1985); *W. Vinten Ltd. v. United States,* 213 Ct.Cl. 759 (1977).

**13.** Plaintiff's argument is in the same vein as the potential argument, not raised by Hughes, that use of the Williams patent by Ford acting on behalf of the United States is not technically an "infringement" under the Patent Act, 35 U.S.C. § 271, but is rather a taking of a patent license by eminent domain. 28 U.S.C. § 1498(a); *Leesona Corp. v. United States,* 220 Ct.Cl. 234, 599 F.2d 958, *cert. denied,* 444 U.S. 991, 100 S.Ct.

522, 62 L.Ed.2d 420 (1979). Clearly the parties did not intend any such narrow interpretation of their sweeping language.

**14.** Three documents from this Maryland district court case (two Hughes memoranda and a court opinion/order) are set forth in Appendix to Defendant's Proposed Findings of Uncontroverted Fact in Support of its Motion for Partial Summary Judgment Respecting the ESA/GEOS Satellites, Vol. I, filed March 24, 1988, Tabs 1–3.

*tian* doctrine" pertaining to implied patent indemnity agreements in government procurement contracts, *G.L. Christian & Assoc. v. United States*, 160 Ct.Cl. 1, 321 F.2d 418, *cert. denied*, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963); *see Carrier Corp v. United States*, 534 F.2d 250, 251 (Ct.Cl.1976), would have been a basis for Ford concern about an indemnity action by the government against Ford with respect to the remaining satellites at issue. One would assume that Ford counsel, intimately familiar with government contracts and their attendant principles, would be cognizant of such potential claims and would surely be intending to terminate any possible indemnity claim by the government. Parties do not obtain releases intending to secure only ultimate victory after hard fought litigation. Parties secure releases and pay the significant sum that Ford paid in this case to be certain that they are not going to be troubled in the future by litigation from any source.[15]

## IX

◾ Finally, because Ford clearly believed that the Hughes-drafted release encompassed the spacecraft Ford had manufactured for the government, plaintiff may not raise the defense of mutual mistake. Not only was Ford mindful of its potential liability to the government, but Ford's clear understanding was that government spacecraft were included in the release. Pl.App., Tab 7 (deposition of K.L. Zerschling), pp. 56–57, 95–96, 119–20, 145, 148–50. At best, therefore, there was a unilateral mistake, which is insufficient as a matter of law to invalidate the release. *W. Vinten, Ltd. v. United States*, 213 Ct.Cl. 759, 760 (1977) (patent holder's "own subjective unilateral mistake" is insufficient to invalidate a release with a government contractor that is held to encompass the government).

## X

Based on the forgoing, defendant is entitled to judgment as a matter of law with respect to all claims based on the 13 Ford-built spacecraft. Accordingly, as previously ordered, defendant's motion for partial summary judgment is granted.

---

15. Although at this juncture, all reasonable inferences are to be drawn in plaintiff's favor, any inference contrary to that stated in text would be unreasonable.