**PARKER BEACH RESTORATION, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 02–231 C.

United States Court of Federal Claims.

Sept. 30, 2003.

Lance Donald Reich, Atlanta, GA, counsel of record for plaintiff.

Scott David Bolden, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, counsel of record for defendant, with whom were Vito J. DiPietro, Director, John J. Fargo, Assistant Director, and Robert D. McCallum, Jr., Assistant Attorney General.

## OPINION

DAMICH, Chief Judge.

### I. Introduction

Before the Court is Defendant's Motion for Summary Judgment on Release from Liability and Authorization and Consent (hereinafter "Def.'s Mot."). The United States (Defendant) seeks dismissal of the patent infringement claim asserted by Parker Beach Restoration, Inc. (Plaintiff). This claim alleged infringement of United States Letter Patent No. 4,710,056 (hereinafter " '056 patent"), which Plaintiff brought pursuant to the Court's jurisdiction under 28 U.S.C. § 1498. Plaintiff claims that Defendant infringed the '056 patent when the United States Air Force participated in a research and development project with Benedict Engineering Company, Inc. (hereinafter "BEC"), a government contractor, involving the use and deployment of mesh-net beach restoration devices (hereinafter "Project Devices"). Be-

cause Defendant is released from liability for infringement under the Confidential Settlement Agreement (hereinafter "Agreement") that was executed by Plaintiff and BEC during a prior suit involving those parties in the Northern District of Florida, summary judgment for the Defendant is appropriate. Further, even if the release did not apply to Defendant, summary judgment would be appropriate because the Government did not give its authorization and consent to BEC to use an infringing device in connection with the project under 28 U.S.C. § 1498.

For the reasons set forth herein, Defendant's Motion for Summary Judgment is GRANTED.

### II. Background

Defendant entered into a Cooperative Research and Development Agreement (hereinafter "CRADA") with BEC. The purpose of the CRADA was "to determine the effectiveness of using porous (net) groynes to accrete sand on shore to extend and re-nourish beaches which are eroding." CRADA App. A ¶ 1.0; App. to Def.'s Mot. for Summ. J. on Release from Liability and Authorization and Consent at A41 (hereinafter "Def.'s App."). The CRADA did not include the Government's standard authorization and consent clause as set forth by 48 C.F.R. §§ 27.202–1(a), 52.227–1.[1] The CRADA did include a non-indemnity clause in the event that infringement occurred, making no guarantee that the project would not infringe an existing patent. CRADA ¶ 10.3; Def.'s App. at A37.[2] The CRADA also contained a provision

---

1. The usual clause states the following:

   (a) The Government authorizes and consents to all use and manufacture, in performing this contract or any subcontract at any tier, of any invention described in and covered by a United States patent (1) embodied in the structure or composition of any article the delivery of which is accepted by the Government under this contract or (2) used in machinery, tools, or methods whose use necessarily results from compliance by the Contractor or a subcontractor with (i) specifications or written provisions forming a part of this contract or (ii) specific written instructions given by the Contracting Officer directing the manner of performance. The entire liability to the Government for infringement of a patent of the United States shall be determined solely by the provisions of

the indemnity clause, if any, included in this contract or any subcontract hereunder (including any lower-tier subcontract), and the Government assumes liability for all other infringement to the extent of the authorization and consent hereinabove granted.

2. The CRADA provides, in pertinent part, that:

   The parties further make no warranty that the use of any *invention* or other intellectual property or product contributed, made or developed *under this agreement* will not infringe any other United States or foreign patent or other intellectual property right. In no event will any party be liable to any other party for compensatory, punitive, exemplary, or consequential damages.

stating that "the parties to this Agreement ... are independent contractors and are not agents of each other .... Neither party is authorized or empowered to act on behalf of the other ...." CRADA ¶ 11.3; Def.'s App. at A38. Pursuant to the CRADA, BEC utilized Project Devices that allegedly infringed the '056 patent. These accused acts of infringement occurred on the grounds of Eglin Air Force Base (hereinafter "Eglin AFB") from November 2000 until May 1, 2001.

Plaintiff brought a lawsuit against BEC in the Northern District of Florida for infringement of the '056 patent. BEC moved for summary judgment, claiming that, because the Project Devices were manufactured for the Government, BEC was immune from liability under 28 U.S.C. § 1498. The district court granted partial summary judgment, holding that BEC was immune from lawsuit for infringement by the devices used at Eglin AFB. The district court instead found that "Plaintiff's only remedy ... is against the United States as outlined in § 1498." Def.'s App. at A26. The court held, inter alia, that Defendant used Plaintiff's beach restoration devices, because the system "was installed and accreted sand on the USAF's beach and USAF personnel monitored and maintained the system." Def.'s App. at A23. On the issue of authorization and consent, the court was not persuaded that the lack of an express authorization and consent clause meant that no authorization and consent was given. Id. at A24. Based on the facts, the court found implied authorization and consent. Specifically, the court found persuasive the fact that the CRADA set forth the specific system to be installed, which was not merely "a collateral device" chosen by BEC. Id. at A25. Furthermore, the court found that the non-indemnification clause did not "state that the government is not liable to another for the use of a patented item." Id. (emphasis in original). Plaintiff and BEC resolved the remaining issues of infringement under the Agreement, and the district court case was dismissed with prejudice pursuant to the Agreement and upon request of the parties. Id. at A138. Plaintiff then filed the current case against the United States.

CRADA ¶ 10.3; Def.'s App. at A37 (emphasis in original).

## III. Analysis

### A. Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Principles of Contract Interpretation

■ "It is well settled that contracts to which the government is a party ... are normally governed by federal law, not by the law of the state where they are made or performed." Prudential Ins. Co. of Am. v. United States, 801 F.2d 1295, 1298 (Fed.Cir. 1986). In the case at bar, however, Defendant was not a party to the Agreement and the parties agree that the Court must apply Florida law. Def. Mot. at 6; Pl.'s Opp'n to Def.'s Mot. for Summ. J. on Release from Liability and Authorization and Consent at 10 (hereinafter "Pl's Opp'n"); see also Augustine Med., Inc. v. Progressive Dynamics, Inc., 194 F.3d 1367, 1370 (Fed.Cir.1999); Sun Studs, Inc. v. Applied Theory Assoc., Inc., 772 F.2d 1557, 1561 (Fed.Cir.1985). The relevant state law in the present case is Florida law because the Agreement was executed in Florida, and the parties to the Agreement agreed that it would "be governed according to the internal laws of the State of Florida." Def.'s App. at A125. "Under Florida law, settlement agreements are governed by the law of contracts." U.S. Fire Ins. Co. v. Caulkins Indiantown Citrus Co., 931 F.2d 744, 749 (11th Cir.1991). As the Agreement is a settlement agreement by nature, it will be governed by Florida contract law.

According to Florida contract law, "[t]he first step in construing an agreement is to

determine whether the language is ambiguous. If the agreement is found to be free of ambiguity, its meaning can be declared by the court without the use of extrinsic evidence." *Monahan v. C.I.R.*, 321 F.3d 1063, 1068 (11th Cir.2003) (citations omitted). Using this approach, the Court finds that Defendant was released from liability based on the plain and unambiguous language of the Agreement between Plaintiff and BEC. Article IV(A) of the Agreement states:

> Parker Beach hereby releases BEC *and all those acting in concert or participation with it or under its direction or control*, its customers and/or end users, and their successors, from any and all claims by reason of BEC's making, using, selling or offering for sale of the BEC Flexible Mesh Net and NU–SHORE Systems, or any other claims arising from the subject matter of said Civil Action and/or which were or could have been asserted by Parker Beach in the Civil Action against BEC from the beginning of BEC's alleged infringement to the effective date of this Agreement.

Def.'s App. at A123–24 (emphasis added). Since Defendant certainly qualifies as one "acting in concert or participation with" BEC, this provision applies to Defendant. The language is clear and unambiguous on its face. Therefore, no resort needs to be made to extrinsic evidence.

However, there is another portion of the Agreement that may affect which parties are covered under the release. Article I(A) of the Agreement states as follows:

> *Except for BEC's United States Government related beach restoration system activity at Eglin Air Force Base*, upon execution of this Agreement, BEC, its respective agents, servants, and employees, *and all those persons in active concert or participation with it* (*not the U.S. Government*), or any of them, will permanently cease and discontinue all manufacturing, using, distributing, selling, marketing or offering for sale, for as long as the '056 patent remains valid and unexpired, the BEC Flexible Mesh Net groins installed at Eglin AFB from November 2000 to April 2001 under a joint project between BEC and the United

States Air Force, or an equivalent device . . . .

Def.'s App. at A122 (emphasis added).

Article I, governing the cease and desist provision of the Agreement, includes language similar to Article IV: "persons in active concert or participation" with BEC, but Article I excludes the Government through use of the wording "[e]xcept for BEC's United States Government related beach restoration system activity at Eglin Air Force Base" and "(not the U.S. Government)." Plaintiff argues that this wording evinces the parties' intent to exclude the Government from the release provision of Article IV as well. Pl.'s Opp'n at 9. However, there is no support for this argument in light of the plain language of the Agreement. Contract construction dictates that, if the Article IV release was not to apply to Defendant, the contract should have so stated, as it did in Article I. *Azalea Park Utils., Inc. v. Knox–Florida Dev. Corp.*, 127 So.2d 121, 123 (Fla.Dist.Ct. App.1961) (quoting 12 Am.Jur. *Contracts* § 239 (1938)) (" 'The absence of a provision from a contract is evidence of an intention to exclude it rather than of an intention to include it.' "); 7 Fla. Practice Series § 7.02 (West 2003) ("[C]ourts will assume that the omission evidences an intention to exclude the provision.").

Plaintiff also argues that Article I can be seen as a definitional provision, which might require the "definition" of "those persons in active concert or participation with" BEC, established in Article I, to be used throughout the Agreement. Pl.'s Opp'n at 8. However, this argument is without merit. Article I of the Agreement is entitled "Cease and Desist." Def.'s App. at A122. It is not a definitional provision, nor is it a preamble to the contract. Therefore, the wording used in Article I is not a definition and thus does not carry forward into other areas of the contract or aid the Court's interpretation of the release provision.

Further, as Defendant points out, the cease and desist provision of Article I could not apply to the Government anyway because a patentee may not obtain an injunction against the United States for patent infringement in district court. Def.'s Reply in Supp.

of Mot. for Summ. J. on Release from Liability and Authorization and Consent at 3 (hereinafter "Def.'s Reply"); *see W.L. Gore & Assoc. v. Garlock, Inc.*, 842 F.2d 1275, 1283 (Fed.Cir.1988); *Robishaw Eng'g Inc. v. United States*, 891 F.Supp. 1134, 1139 (E.D.Va. 1995). Therefore, the reference to the Government in Article I does not help Plaintiff.

Defendant argues that this Agreement is akin to the agreement in *Hughes Aircraft v. United States*, 15 Cl.Ct. 550 (1988), *aff'd in part, dismissed in part by U.S. v. Aerospace Corp.*, 862 F.2d 320 (Fed.Cir.1988) (table case). In that case, J. Turner found the provision clear on its face and held that extrinsic evidence did not apply. His analysis is illustrative:

> The release executed by Hughes specifically creates a category of third party beneficiaries to the contract of release, to wit., "all customers" of Ford and "all users" of Ford-manufactured goods .... Phrases such as "all customers" and "all users" could hardly be more clear cut and categorical. " 'All' means 'all' without requiring the insertion of the names of any and all other persons." *Morison v. General Motors Corp.*, 428 F.2d 952, 953 (5th Cir.), *cert. denied*, 400 U.S. 904, 91 S.Ct. 142, 27 L.Ed.2d 141 (1970). To read implied limitations into the release would require contortion of the release language.

*Id.* at 554. The *Hughes Aircraft* case is persuasive here, as similar language is present in the releases of both that case and the case at hand. In *Hughes Aircraft*, the language of release was "all customers" and "all users." *Id.* In the present case, the language is very similar, with the Agreement releasing BEC and "all those acting in concert or participation with it or under its direction or control." Def.'s App. at A123–24. As *Hughes Aircraft* held, "all" does mean "all;" therefore, the Government is included in the release.

Because the Agreement is clear on its face, Florida law will not permit the Court to consider extrinsic evidence. *See Boat Town U.S.A. v. Mercury Marine Division of Brunswick Corp.*, 364 So.2d 15, 17 (Fla.Dist. Ct.App.1978) ("[I]t is settled law in Florida that a court may resort to the process of interpretation only when the words used in a contract are unclear. The ambiguity must exist on the face of the document itself before extrinsic matters may be considered by the court.") (citations omitted); *see also Acceleration Nat. Serv. Corp., v. Brickell Fin. Servs. Motor Club, Inc.*, 541 So.2d 738, 739 (Fla.Dist.Ct.App.1989). As a result, extrinsic evidence may not be examined, and Defendant is released from any alleged infringement of the '056 patent.

## C. Florida Statute ch. 768.041

■ Even though consideration of extrinsic evidence is not appropriate under the rules of contract construction, extrinsic evidence could possibly be considered under Florida Statute ch. 768.041. Plaintiff claims that this statute governs the interpretation of the Agreement. Florida Statute ch. 768.041(1) (2003) provides:

> A release or covenant not to sue as to one tortfeasor for property damage to, personal injury of, or the wrongful death of any person shall not operate to release or discharge the liability of any other tortfeasor who may be liable for the same tort or death.

Plaintiff argues that patent infringement is a personal tort and that Defendant is a joint tortfeasor with BEC. Pl.'s Opp'n at 11. The Court of Claims, however, has held that "[t]he theory for recovery against the government for patent infringement is not analogous to that in litigation between private parties. When the government has infringed, it is deemed to have 'taken' the patent license under an eminent domain theory ...." *Leesona Corp. v. United States*, 220 Ct.Cl. 234, 599 F.2d 958, 964 (1979), *cert. denied* 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979).

Moreover, the Government is not liable as a contributory infringer:

> [T]he Government is not liable for its inducing infringement by others, for its conduct contributory to infringement of others, or for what, but for section 1498, would be contributory (rather than direct) infringement of its suppliers. Although these activities have a tortious ring, the

Government has not agreed to assume liability for them. In short, under section 1498, the Government has agreed to be sued only for its direct infringement of a patent. *Decca Ltd. v. United States*, 225 Ct.Cl. 326, 640 F.2d 1156, 1167 (1980). Therefore, since § 1498 infringement by the Government is based on an eminent domain theory, limited to direct infringement, and since patent infringement does not sound in tort, Defendant cannot be a tortfeasor, and Florida Statute ch. 768.041 does not apply to it.[3] The Court should thus use Florida common law to interpret the Agreement and should not consider the above statute.

Furthermore, none of the three classifications of injury set forth in the statute has occurred in this case. First, patent infringement has historically not been considered property damage. For instance, while interpreting Florida Statute ch. 48.193(1)(f), the *Response Reward Systems* court found that it lacked jurisdiction over the plaintiff's claim because the claim was not for personal injury or property damage, but involved "only patent infringement." *Response Reward Sys., L.C. v. Meijer, Inc.*, 189 F.Supp.2d 1332, 1337 (M.D.Fla.2002). Plaintiff even admitted to the lack of case law classifying patent infringement as property damage during oral argument on August 20, 2003.[4] Second, wrongful death and personal injury clearly do not apply in this case. Therefore, Florida Statute ch. 768.041 is not relevant to the Court's decision today.

Even if, at the time of the Agreement, Plaintiff believed that the Florida statute addressed the situation, it would be irrelevant because a unilateral mistake of law in the writing of a contract does not change the meaning of that contract. A unilateral mis-

take is not cause for the reformation of the contract. *Siren, Inc. v. Estes Express Lines*, 249 F.3d 1268, 1272 (11th Cir.2001); *Kartzmark v. Kartzmark*, 709 So.2d 583, 585 (Fla. Dist.Ct.App.1998) ("Generally a unilateral mistake is not a ground for reformation."); *Robinson v. Wright*, 425 So.2d 589, 589 (Fla. Dist.Ct.App.1982) ("A written contract will not be reformed on the basis of a unilateral mistake absent clear and convincing proof of fraud or inequitable conduct by the other side."); *Restatement (Second) of Contracts* § 153. Therefore, a unilateral mistake on the Plaintiff's part would not have any effect on the validity or meaning of the Agreement.

Under Florida common law, Defendant's interpretation prevails and the Government is deemed included in the release, due to the plain and unambiguous language of said release. Therefore, Defendant has been released from any liability for alleged infringement of Plaintiff's '056 patent.

### D. Patent Infringement

■ It is unnecessary, for purposes of deciding this case, to reach the issue of patent infringement, since Defendant has been released from liability under the Agreement between Plaintiff and BEC. However, for completeness in addressing Defendant's motion, the Court will examine the issue. The rule on infringement by the Government is that the United States can only be held liable for patent infringement if it: 1) directly uses or manufactures a patented invention without a license, and/or 2) authorizes or consents to the use or the manufacture of a patented invention by a contractor without a license for its benefit. 28 U.S.C. § 1498(a); *Hughes Aircraft Co. v. United States*, 209 Ct.Cl. 446, 534 F.2d 889, 897 (1976).[5]

---

3. This interpretation is consistent with *Zoltek Corp. v. United States*, which held that § 1498 creates a cause of action, the basis of which is eminent domain. 51 Fed.Cl. 829, 835, 838 (Fed. Cl.2002).

4.

THE COURT: [D]o you have any cases that would indicate that the interpretation of 768.041, the phrase "property damage" applies to intellectual property?
MR. REICH [counsel for Plaintiff]: No, I don't have any case law that says that, Your Honor.

Parker Beach Restoration v. United States, Aug. 20, 2003 Tr. at 20.

5. 28 U.S.C. § 1498(a) provides that:

Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and

### 1. Direct Use

Defendant did not use or manufacture the accused device directly. The Federal Circuit has found that the government directly used an invention when it "assume[d] sole responsibility" for the procurement, testing and commanding of the device. *Id.* at 902. In contrast, when the use of a device is by a contractor and not by the government, the use is not by the Government within the meaning of § 1498. Since the Project Devices at issue in this case were actually used by BEC, the Government's contractor, instead of the Government itself, there was no direct use of the '056 by Defendant.

### 2. Authorization and Consent

■ The United States could also be liable for patent infringement if it consented or authorized its contractor to act in a way that infringed a patent. *Hughes,* 534 F.2d at 897. This authorization and consent can be either express or implied. *TVI Energy Corp. v. Blane,* 806 F.2d 1057, 1060 (Fed.Cir.1986).

Defendant did not expressly authorize and consent to BEC's infringing use of the accused device. Although not required by § 1498 itself, the Government generally consents and authorizes the use of a particular device by inserting an authorization and consent clause into its contracts, according to federal procedures. *See* 48 C.F.R. §§ 27.201–1, 52.227–1 (directing contracting officers to insert a standard clause into contracts under specific circumstances); *Hughes Aircraft,* 534 F.2d at 900 (comparing an authorization clause to "the standard blanket authorization and consent clause utilized in regular defense contracts").[6] The CRADA agreement here did not contain a standard clause. To the contrary, the parties disclaimed any liability to each other for patent infringement by including a non-indemnification clause, under which Defendant assumed

no responsibility for any patent infringement and directly denied any liability. CRADA ¶ 10.3; Def.'s App. at A37.[7]

■ The alternative way for the Government to authorize and consent to infringing use of a patent is implied authorization and consent, which may be given "by contracting officer instructions, by specifications or drawings which impliedly sanction and necessitate infringement, [or] by post hoc intervention of the Government in pending infringement litigation against individual contractors." *Hughes Aircraft,* 534 F.2d at 901. The guidance of the Federal Circuit and Court of Claims aids the Court in determining whether Defendant gave its authorization and consent to BEC in the present case. The Court of Claims in *Carrier Corp. v. United States* construed § 1498 in a narrow manner. 208 Ct.Cl. 678, 534 F.2d 244, 248 (1976). The *Carrier* court found that the availability of non-infringing equipment meant that the government did not require the use of the accused device and therefore did not consent to such use. *Id.* The court also found that contract provisions requiring the contracting officer to inspect and approve the accused device did not amount to consent. *Id.* The court stated that "[t]o hold otherwise would, in effect, mean that in every instance where the Government desires to avoid potential liability under Section 1498(a), it would be required to conduct a detailed and time-consuming investigation to determine whether the equipment the contractor selects for his own convenience infringes any outstanding patents." *Id.*

Although there are clear specifications outlined in the CRADA, Def.'s App. at A42–43, the evidence does not show that the specifications required infringement of Plaintiff's patent. Plaintiff's patented device had nine critical elements, *id.* at A146, which "must [have been] either literally or equivalently present

---

entire compensation for such use and manufacture .... For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States.

6. See *supra* note 1 for the text of the authorization and consent clause generally used by the Government in like circumstances.

7. For the text of the Agreement's non-indemnification clause, see *supra* note 2.

in the accused devices in order for Parker Beach to show infringement." Pl.'s Resp. to Def.'s Proposed Findings of Uncontroverted Fact at 7. Although Parker Beach's system was mentioned in the CRADA as a system shown to be effective, the CRADA specifically differentiates the groyne in the proposed system and states that the proposed system has been designed and patented, and licensed to BEC. CRADA App. ¶ 2.0; Def.'s App. at A42. Moreover, the testimony of Jerry Jones, who was the officer in charge of technology transfer for Defendant, demonstrates that some of the critical elements of the Parker Beach patent were not required by the CRADA or the Air Force, such as "weighted bottom edges," or "top edges suspended above high tide line." Jones Dep. at 34–35; Def.'s App. at A64–65. In addition, Art. III of the Agreement specifies that the "semi-rigid plastic groins" of BEC's NU–SHORE system, which were used for a period of time at Eglin, do not infringe Plaintiff's patent. Def.'s App. at A123. According to Jones, the BEC NU–SHORE system, otherwise referred to as the "Third Generation mesh" was installed on a gradual basis beginning in November–December 2001 and was removed before May 2002. Jones Dep. at 28; Def.'s App. at A63. Accordingly, application of the *Carrier* test shows that the Government did not "require" use of the patented technology; therefore, Defendant in this case did not authorize and consent to BEC's use of Plaintiff's patent.

However, the Federal Circuit in *TVI Energy Corp. v. Blane* construed § 1498 more broadly, finding that "[t]he mere fact that the Government specifications for the targets did not absolutely require Blane to infringe TVI's patent ... does not extinguish the Government's consent." 806 F.2d 1057, 1060 (Fed.Cir.1986). The court based its interpretation on the policy behind 28 U.S.C. § 1498(a). *Id.* It held:

> To limit the scope of § 1498 only to instances where the Government requires by specification that a supplier infringe another's patent would defeat the Congressional intent to allow the Government to procure whatever it wished regardless of possible patent infringement. The coverage of § 1498 should be broad so as not to limit

> the Government's freedom in procurement by consideration of private patent infringement.

*Id.* (footnotes omitted).

*TVI* is distinguishable, though, in that *TVI* did not decide that the Government had infringed based on authorization and consent, but only held that the bidder for a government contract, who allegedly infringed plaintiff's patent, was immune under § 1498 from an infringement action. *Id.* at 1059–60. The Court specifically says that it "do[es] not find it necessary to answer here the question of whether TVI has a cause of action against the Government for patent infringement."

Even if *TVI* applies and infringement is not required by the Government for there to be authorization and consent, Defendant did not meet the rest of the test for infringement through implied authorization and consent. The *Hughes Aircraft* case, as mentioned above, states that authorization and consent can be implied "by contracting officer instructions, by specifications or drawings which impliedly sanction and necessitate infringement, [or] by post hoc intervention of the Government in pending infringement litigation against individual contractors." 534 F.2d at 901.

First, the contracting officer Jerry Jones did not "impliedly sanction or necessitate infringement." *Id.* As stated previously, although Parker Beach's system was mentioned in the CRADA as a system shown to be effective, the CRADA specifically differentiates the groyne in the proposed system and states that the proposed system has been designed and patented and licensed to BEC. CRADA App. ¶ 2.0; Def.'s App. at A42. Moreover, the testimony of Jerry Jones demonstrates that some of the critical elements of the Parker Beach patent were not required by the CRADA or the Air Force, such as "weighted bottom edges," or "top edges suspended above high tide. line." Jones Dep. at 34–35; Def.'s App. at A64–65. Thus, Defendant did not "impliedly sanction or necessitate infringement," because there is evidence in the record that there were other means open to BEC to meet the speci-

**134**

fications of the CRADA without infringing Plaintiff's patent.

Second, the facts suggest that Defendant did not intervene in infringement litigation against the contractor BEC. In fact, Defendant did not even have knowledge of the infringement. The CRADA indicates that the proposed system was patented and owned by Beach Reclamation, Inc., who licensed it to BEC. CRADA App. A ¶ 2.0; Def.'s App. at A42. The Parker Beach patent was not mentioned in the CRADA. *Id.* Additionally, Jerry Jones testified that Air Force personnel were not aware of Plaintiff's patent. Jones Dep. at 48; Def.'s App. at A68. Further, Defendant was never officially given notice of the infringement lawsuit. Mr. Jones testified that Defendant became aware of the lawsuit against BEC only upon its filing, Jones Dep. at 69; Def.'s App. at A73, which occurred after the alleged period of liability. Compl. at 1–2, Def.'s App. at A1–2 (showing that the complaint was filed on March 25, 2002, while the alleged acts of infringement occurred between November 2000 and May 2001). Under this test, even without a need for the specifications "requiring" BEC to infringe, Defendant cannot be found to have authorized and consented to BEC's use of Parker Beach's patented technology.

## IV. Conclusion

Defendant was released from an infringing activity when Plaintiff and BEC signed the Confidential Settlement Agreement. The plain language of the Agreement attests to this fact. As a result, there is no genuine issue of material fact, and Defendant is entitled to judgment as a matter of law. Because the release clause in the Agreement disposes of this case, there is no need to look at the authorization and consent issue also raised in Defendant's motion. However, even if authorization and consent were relevant to the outcome of this case, it would not prevent summary judgment because Defendant's activities did not constitute authorization and consent under 28 U.S.C. § 1498. For these reasons, Defendant's Motion for Summary Judgment is hereby GRANTED.

The Clerk's Office is instructed to enter judgment for Defendant.