86 F.3d 1566
 39 U.S.P.Q.2d 1065
 HUGHES AIRCRAFT COMPANY, Plaintiff-Appellant,
v.
The UNITED STATES, Defendant/Cross-Appellant.
 Nos. 94-5149, 95-5001.
 United States Court of Appeals,
Federal Circuit.
 June 19, 1996.
 
 Kenneth W. Starr, Kirkland & Ellis, Washington, D.C., argued for plaintiff-appellant. With him on the briefs were Philip C. Swain and Jay I. Alexander, Washington, D.C., and William A. Streff, Jr., Chicago, Illinois. Of counsel were Victor, G. Savikis, Jones, Day, Reavis & Pogue, Los Angeles, California, and John J. Higgins and Wanda K. Denson-Low, Hughes Aircraft Company, Los Angeles, California.
 Thomas J. Byrnes, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., argued for defendant/cross-appellant. With him on the brief were Frank W. Hunger, Assistant Attorney General, Vito J. DiPietro, Director, William C. Bergmann, Janice M. Mueller, Edward H. Rice, and Paul F. McCaul, Attorney, Manhattan Beach, California. Of counsel was B. Frederick Buchan, Jr., Attorney, Department of Justice.
 Before ARCHER, Chief Judge, NIES, Senior Circuit Judge,* and BRYSON, Circuit Judge.
 Opinion for the court filed by Chief Judge ARCHER. Concurring opinion filed by Circuit Judge BRYSON. Dissenting opinion filed by Senior Circuit Judge NIES.
 ARCHER, Chief Judge.
 
 
 1
 Hughes Aircraft Company (Hughes) appeals the judgment of the United States Court of Federal Claims awarding Hughes compensation based on a 1% royalty rate with respect to spacecraft manufactured and used by or for the United States which embody the invention of Hughes' United States Patent No. 3,758,051 (the Williams patent). Hughes Aircraft Co. v. United States, 31 Fed. Cl. 481, 35 USPQ2d 1243 (1994) (Hughes XII ).[1] Hughes argues that the 1% royalty rate is too low. The United States cross-appeals contending that certain spacecraft were incorrectly included in the royalty base and that the interest rates used to calculate Hughes' delay damages were too high. We affirm.
 
 BACKGROUND
 
 2
 A. The Williams patent relates to an apparatus for controlling the orientation of the spin axis of spin-stabilized space vehicles such as satellites positioned in orbit around the earth. The patent was issued to Donald Williams on September 11, 1973. To correct orbital deviations, the Williams apparatus applies a reactive force to the satellite by firing a jet so as to "precess," or tip, the satellite into the proper position. Although this technique was known in the prior art,[2] the Williams apparatus was the first to maintain its spin axis with reference to a fixed external coordinate system. Hughes Aircraft Co. v. United States, 717 F.2d 1351, 1360, 219 USPQ 473, 479 (Fed.Cir.1983) (Hughes VII ).
 
 
 3
 The present suit began in 1973 when Hughes brought a claim under 28 U.S.C. § 1498 against the United States for just compensation stemming from the use and manufacture by or for the government of spacecraft embodying the invention claimed in the Williams patent. During the course of the protracted litigation that followed, it was determined by the Court of Federal Claims that Hughes is entitled to just compensation with respect to 81 spacecraft. Hughes Aircraft Co. v. United States, 29 Fed. Cl. 197, 243-48, 29 USPQ2d 1974, 2010 (1993) (Hughes X ). The court arrived at the final list of 81 spacecraft based in part on the 1983 decision of this court that certain accused spacecraft that use the "store and execute" method for controlling the precession jet infringe the claims of the Williams patent under the doctrine of equivalents. Hughes VII, 717 F.2d at 1366, 219 USPQ at 484. The Court of Federal Claims then found the value of the compensation base for calculating Hughes' award to be $3.577 billion, which was arrived at by using "total spacecraft cost," i.e., the total procurement cost, including payload costs, to the government of the 81 spacecraft. Hughes Aircraft Co. v. United States, 31 Fed. Cl. 464, 468 n. 5, 477 (1994) (Hughes XI ).
 
 
 4
 In Hughes XII, the Court of Federal Claims considered only the calculation of the amount of Hughes' award. The court first determined what royalty rate to apply to the compensation base to provide Hughes a reasonable royalty for the government's use of the patented invention. The court then considered the amount of pre-judgment interest (sometimes called "delay damages"), which together with the reasonable royalty would provide "reasonable and entire compensation." Hughes XII, 31 Fed.Cl. at 483, 35 USPQ2d at 1251. Because an established royalty rate did not exist for licensing the Williams patent, the court determined the royalty rate using the "willing buyer/willing seller" rule. Id. at 484, 35 USPQ2d at 1245. Under this rule, a reasonable royalty is set at the rate that the court determines a "willing licensor and licensee would bargain for at hypothetical negotiations on the date infringement started." State Indus. v. Mor-Flo Indus., 883 F.2d 1573, 1580, 12 USPQ2d 1026, 1031 (Fed.Cir.1989).
 
 
 5
 The court's royalty rate analysis focused initially on three letters containing acceptable license terms that Hughes had sent to other aerospace companies during the period from 1974 to 1978, none of which resulted in a licensing agreement. The first was a July 1974 letter from Hughes to the Philco-Ford Corporation (Philco-Ford) offering to license the Williams patent and the McLean patent together for 5%, or separately for 3%, of "the sales price of the satellite calculated at the time it is delivered to the launch pad." Hughes XII, 31 Fed. Cl. at 486, 35 USPQ2d at 1246. Although Hughes' letter was sent while a suit was pending against Philco-Ford in which Hughes accused Philco-Ford of infringing the Williams patent, the court found nothing in the letter to suggest that the offer was part of a proposed settlement of the litigation and found that the letter was sent by Hughes merely in response to earlier requests by Philco-Ford for terms at which any licenses had been offered to parties unrelated to the suit. Id. at 486, 35 USPQ2d at 1247.
 
 
 6
 The second letter relied on by the court was sent by Hughes to TRW, Inc. (TRW) in September of 1974 and offered a license at the identical rate described in the letter to Philco-Ford. Id. at 486, 35 USPQ2d at 1247. The court noted that there had never been any litigation or threat of litigation between Hughes and TRW relating to the Williams patent. Id. at 486, 35 USPQ2d at 1247. With regard to the TRW and Philco-Ford letters, the court found it significant that the anticipated royalty base underlying those offers was smaller than the royalty base in this case. Id. at 487, 35 USPQ2d at 1247.
 
 
 7
 The third letter was sent by Hughes to Messerschmitt-Bolkow-Blohm (MBB), a German corporation, as part of a series of letters regarding settlement of claims by Hughes against MBB. Id. at 487, 35 USPQ2d at 1247. As such, the court recognized that this letter could not fairly be considered an ordinary proposal of licensing terms. Id. at 487, 35 USPQ2d at 1247. The court instead relied on language in the letter in which Hughes stated that its "normal royalty rate" for licensing the Williams and McLean patents together was 5% of the "full contact price" for a commercial spacecraft or 2% of the "full contract price" for a scientific or experimental spacecraft, with the provision that the cost of scientific or experimental spacecraft did not include the cost of scientific or experimental payloads provided to MBB by others. Id. at 487, 35 USPQ2d at 1247. The court found that all of the 81 spacecraft in the royalty base were "scientific or experimental vehicles." Id. at 487, 35 USPQ2d at 1247. As Hughes had done in its Ford-Philco and TRW letters, the court reduced the 2% rate quoted in the MBB letter for both the Williams and McLean patents by a factor of 40% to arrive at a 1.2% rate for licensing only the Williams patent for scientific or experimental vehicles. Id. at 487, 35 USPQ2d at 1247.
 
 
 8
 Based on the three offers, the Court of Federal Claims reasoned that negotiations would start at a rate of something less than 1.2% and that the negotiated rates would not fall below the 1% rate the government conceded would result in just compensation. Id. at 488, 35 USPQ2d at 1248. According to the court, the royalty rate would "quickly settle on one percent." Id. at 488, 35 USPQ2d at 1248. As additional support for the 1% royalty rate, the court pointed to the large size of the royalty base in this case. The court said that "[i]t is axiomatic that the larger the potential compensation base to which a royalty rate will be applied, the lower will be the rate." Id. at 488, 35 USPQ2d at 1248-49. The court also noted that Williams was not a "pioneer" invention, that the license taken by the government was non-exclusive and unaccompanied by know-how, that the Hughes license offers to the aerospace companies were not accepted, and that Hughes had an incentive to discourage the development of alternative technology and encourage the use of the Williams invention. Id. at 488-89, 35 USPQ2d at 1249-50. As to this last factor the court found that alternatives to the Williams invention existed in 1973 or were soon after developed. Id. at 489-90, 35 USPQ2d at 1250. Based on all of these factors, the court determined that a royalty rate of 1% would be reasonable.
 
 
 9
 The Court of Federal Claims next considered the appropriate interest rate to use in calculating the delay damages to be awarded Hughes because royalties were not currently paid. The court viewed delay damages as necessary to place Hughes in the position that it would have been had the royalties been paid timely and invested in a prudent and reasonable manner. Id. at 492, 35 USPQ2d at 1251-52. For the period from September 11, 1973 to February 1, 1980, the court used rates which it viewed as required by or adopted in prior decisions for the years in question, citing Tektronix, Inc. v. United States, 213 Ct.Cl. 257, 552 F.2d 343, 193 USPQ 385 (1977), Miller v. United States, 223 Ct.Cl. 352, 620 F.2d 812 (1980), and Bendix Corp. v. United States, 230 Ct.Cl. 247, 676 F.2d 606 (1982). Specifically, it used a rate of 7.5% for the period up to 1975 and a rate of 8.5% for the period from 1976 to February 1, 1980. Hughes XII, 31 Fed. Cl. at 492-93, 35 USPQ2d at 1252-53. For the remainder of the period of delay, the court applied the relevant tax overpayment rate as prescribed in 26 U.S.C. § 6621, which was defined as 2% above the federal short term rate determined by the Secretary of the Treasury. The court found the tax overpayment rates to be fair, easily ascertainable, commercially reasonable, and objective, with the federal short term rate reflecting the short-term financial market and the 2% additional margin taking into account the fact that long term investments generally earn higher rates. Id. at 494, 35 USPQ2d at 1253-54. The court held that the delay damages for the period from 1973 to 1980 should be compounded annually and for the period after February 1, 1980 should be compounded daily as provided for in the tax overpayment compounding provision, 26 U.S.C. § 6622(a). Id. at 493, 494-95, 35 USPQ2d at 1253, 1254.
 
 
 10
 B. In this appeal Hughes puts forth several grounds for reversing the Court of Federal Claims' decision that its compensation should be limited to a 1% royalty rate. Hughes argues that the court erred as a matter of law by treating the rates contained in the letters to Ford-Philco, TRW and MBB as a ceiling on the royalty rate. Also, Hughes asserts that the rates contained in the letters were artificially low due to widespread infringement of the Williams patent and due to the settlement context in which two of them were sent. Hughes further contends that reliance on the letters was improper because this conflicts with the policy behind Federal Rule of Evidence 408 which in certain circumstances requires the exclusion of evidence of offers made attempting to compromise a disputed claim. Finally, Hughes argues that the determination of the 1% royalty award was based upon three clearly erroneous factual findings. Specifically, Hughes takes issue with the findings that all of the 81 spacecraft determined to be compensable were "scientific or experimental" as that designation was used in the MBB letter, that the royalty base contemplated in the three letters was relatively smaller than the royalty base at issue here, and that during the term of the Williams patent non-infringing substitutes were available. Although it sought a 15% royalty rate before the Court of Federal Claims, Hughes now argues that it is entitled to at least a 3% royalty rate, which it derives from the proffered royalty rate for license of the Williams patent as set forth in two of the letters to the aerospace companies.
 
 
 11
 The government in its cross-appeal makes two arguments. First, it contends that the delay compensation rates were erroneous as a matter of law because they reflect a risk premium that Hughes did not bear. Moreover, the government says the court erred in failing to account for the annual taxes Hughes would have been required to pay had the royalties been paid currently. Second, the government asserts that Hughes is not entitled to compensation for spacecraft using the "store and execute" method for controlling the precession jet because, despite the contrary holding in Hughes VII, these spacecraft do not infringe the Williams patent. The government asks us to reject Hughes VII as law of the case in view of the subsequent holding in Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 4 USPQ2d 1737 (Fed.Cir.1987) (in banc ), which it suggests is inconsistent with the doctrine of equivalents analysis applied in Hughes VII.
 
 DISCUSSION
 I.
 
 12
 A. The government's unlicensed use of a patented invention is properly viewed as a taking of property under the Fifth Amendment through the government's exercise of its power of eminent domain and the patent holder's remedy for such use is prescribed by 28 U.S.C. § 1498(a). Pitcairn v. United States, 212 Ct.Cl. 168, 547 F.2d 1106, 1114, 192 USPQ 612, 616 (1976); see also Leesona Corp. v. United States, 220 Ct.Cl. 234, 599 F.2d 958, 966-67, 202 USPQ 424, 432-33 (1979) (discussing the various ways patent infringement by the government was characterized prior to the enactment of 28 U.S.C. § 1498); Decca Ltd. v. United States, 225 Ct.Cl. 326, 640 F.2d 1156, 1166, 209 USPQ 52, 59 (1980). Under section 1498(a), the patent owner is entitled to its "reasonable and entire compensation for such use and manufacture." Because recovery is based on eminent domain, the proper measure is "what the owner has lost, not what the taker has gained." Leesona, 599 F.2d at 969, 202 USPQ at 435. Generally, the preferred manner of reasonably and entirely compensating the patent owner is to require the government to pay a reasonable royalty for its license as well as damages for its delay in paying the royalty. See, e.g., Decca, 640 F.2d at 1167-68, 209 USPQ at 60 (discussing the various methods for valuing a patent license taken by the government); Leesona, 599 F.2d at 973, 202 USPQ at 438 (same). The parties do not dispute that this is the proper form of compensation; rather, they disagree as to the amount of compensation due and the manner in which it was determined.
 
 
 13
 Valuation determinations for purposes of eminent domain are reviewed for clear error as are determinations of what constitutes a reasonable royalty. Whitney Benefits, Inc. v. United States, 926 F.2d 1169, 1177-78 (Fed.Cir.1991); Branning v. United States, 784 F.2d 361, 364 (Fed.Cir.1986); SmithKline Diagnostics, Inc. v. Helena Lab. Corp., 926 F.2d 1161, 1164, 17 USPQ2d 1922, 1925 (Fed.Cir.1991); Unisplay, S.A. v. American Elec. Sign Co., 69 F.3d 512, 517 n. 8, 36 USPQ2d 1540, 1544 n. 8 (Fed.Cir.1995). We will reverse a finding as clearly erroneous only if on the entire evidence we "are left with the definite and firm conviction that a mistake has been committed." SmithKline, 926 F.2d at 1164, 17 USPQ2d at 1925 (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). In determining what constitutes a reasonable royalty, the court has discretion to make certain subsidiary decisions, such as what methodology to use to arrive at a reasonable royalty, and those decisions are reviewed for an abuse of discretion. SmithKline, 926 F.2d at 1164, 17 USPQ2d at 1925; Unisplay, 69 F.3d at 517 n. 8, 36 USPQ2d at 1544 n. 8.
 
 
 14
 B. Hughes asserts that the Court of Federal Claims held as a matter of law that the rates contained in the letters to Ford-Philco, TRW and MBB established a ceiling to the royalty rate. It contends that this was a legal conclusion, not a factual finding, and that the court's conclusion is erroneous. The court, however, did not hold as a matter of law that a reasonable royalty can never go above the amount specified in a license offer. Rather, the court analyzed the three letters at issue, as well as other factors, Hughes XII, 31 Fed. Cl. 481 at 488-90, 35 USPQ 2d at 1248-50, and found that in this case the rates quoted in the letters had the effect of placing a ceiling on the royalty rate. See Unisplay, 69 F.3d at 519, 36 USPQ2d at 1545-46 (holding that a reasonable royalty larger than that contained in license proposals and agreements was not supported by the evidence). Thus, while trying to cast its argument as one attacking a legal conclusion, Hughes is in essence challenging the court's factual findings based on its weighing of the evidence. That, however, is the special province of the trial court and we review such factual findings for clear error. Inwood Lab., Inc. v. Ives Lab., Inc., 456 U.S. 844, 856, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982).
 
 
 15
 Both parties rely on the Court of Claims decision in Pitcairn to support their respective positions on whether offers to license a patented invention should or should not be viewed as a ceiling to the reasonable royalty. Pitcairn, however, provides no hard and fast rule. Pitcairn illustrates that the circumstances surrounding the industry as a whole as well as other relevant factors should be considered to determine what weight to afford an offer to license an invention. The facts of a particular case may call for a reasonable royalty that is more, less or the same as the offered royalty. See Pitcairn, 547 F.2d at 1118, 192 USPQ at 618-19 (finding it appropriate under the facts of that case to take into account offers to license a patent when determining a reasonable royalty).
 
 
 16
 The Court of Federal Claims, as is appropriate, looked at the relevant facts and circumstances at the time when infringement began. As set forth above, the court relied on numerous factors in addition to the Hughes license offers as supporting its finding that hypothetical negotiators would not have agreed to a license at a rate greater than 1.2%. Based on the evidence we are not convinced that the court clearly erred in determining that the ceiling royalty rate in a hypothetical negotiation would be 1.2%.
 
 
 17
 Hughes also contends that the court clearly erred by failing to take into account the consequence of widespread infringement of the Williams patent. We discern no such failing and are not convinced that any upward adjustment of the court's royalty determination is required for this reason.
 
 
 18
 The cases cited by Hughes do not, as it argues, support the broad proposition that the court must reject or give very little weight to offers made when there is widespread infringement. Rather these cases stand for the proposition that the entirety of the circumstances should be considered and that the court can consider the effects of infringement. See, e.g., Sun Studs Inc. v. ATA Equip. Leasing, Inc., 872 F.2d 978, 994, 10 USPQ2d 1338, 1351 (Fed.Cir.), vacated in part, 872 F.2d 978, 11 USPQ2d 1479 (Fed.Cir.1989), overruled on other grounds, A.C. Aukerman Co. v. R.L. Chaides Const. Co., 960 F.2d 1020, 22 USPQ2d 1321 (Fed.Cir.1992) (stating that a court can take into account the commercial consequences of infringement and need not act as if there had been no infringement); Deere & Co. v. International Harvester Co., 710 F.2d 1551, 1557, 218 USPQ 481, 486 (Fed.Cir.1983) (stating that the district court could discount the probative value of a license negotiated against a backdrop of continuing litigation); Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078-79, 219 USPQ 679, 682 (Fed.Cir.1983) (stating the trier of fact did not err in rejecting offers to license after infringement had begun as evidence of an established royalty); Nickson Indus. v. Rol Mfg. Co., 847 F.2d 795, 798, 6 USPQ2d 1878, 1880 (Fed.Cir.1988) (stating that a higher royalty "may be awarded when the evidence clearly shows that widespread infringement made the established royalty artificially low").
 
 
 19
 While we agree that it is appropriate to look at what effect infringement has had on the value of a patent, the court need not consider that in a vacuum. It should take into account other evidence as was done in this case. The court expressly found that at the time of issuance of the Williams patent in 1973 "the space industry was a booming one with prospects for exponential growth" and that "[t]his was the context of Hughes' contacts with three major aerospace firms over the period from 1974 to 1978 in an effort to license the Williams patent." Hughes XII, 31 Fed. Cl. at 486, 35 USPQ2d at 1246. The court also considered the context in which the offers were made. It noted that one was made while litigation was pending but as a continuation of earlier licensing negotiations and not in settlement of that claim, that one was made in settlement of claims but contained an indication of "normal" royalty rates and that the other was made while no litigation was pending. In addition, apart from its conclusory statements that infringement must have lowered the rates offered, Hughes has pointed to no evidence showing that the offers in the letters were actually reduced because of widespread infringement. While Hughes points to certain instances of infringement, it does not show that the license offers were affected by these infringements. In contrast, the court found that one of the letters expressly stated that the proffered royalty rate was Hughes' "normal" rate, not a low rate it was willing to accept because of infringement, thus belying on its face Hughes' contention that the royalty rate was depressed by infringement.
 
 
 20
 Because the Court of Federal Claims considered the infringement context in which the licensing offers were made as well as other pertinent facts, we are not convinced that the court clearly erred in failing to find that widespread infringement had depressed the indicated royalty rate.
 
 
 21
 Hughes' claim that the litigation context surrounding the Ford-Philco and MBB letters artificially lowered the rates contained in those letters is intertwined with the foregoing contention. Hughes also argues that those letters were statements made in compromise negotiations and that the court's consideration of them violates the policy behind Federal Rule of Evidence 408. Before the Court of Federal Claims, however, Hughes had no objection to the introduction of these letters and stated that because this case was tried to the court it was sure the letters would "be given the weight they deserve." Unable now to challenge their admissibility, Hughes attacks the weight given these letters by the Court of Federal Claims. We have previously related the court's discussion of the litigation context of these offers, as well as other factors the court considered. Suffice it to say that we discern no clear error in the court's consideration of the Ford-Philco and MBB offers or in its failure to agree with Hughes' contention that the litigation artificially lowered the royalty rates proposed in these license offers.
 
 
 22
 Hughes also argues that the court's finding that the government's spacecraft were "scientific or experimental" as opposed to "commercial" as those terms were used in the MBB letter is clearly erroneous. After consideration of all the evidence, the court determined that the spacecraft were more akin to scientific and experimental vehicles than commercial vehicles. This finding is supported by the testimony of both parties' experts who each stated that the satellites were experimental and that the government was not in the business of operating satellites for profit. Moreover, Hughes has failed to point to any evidence showing that the spacecraft were being used for commercial purposes, that commercial profit was made, or that any other such indicia of commerciality existed. We therefore cannot say the court clearly erred in finding that the spacecraft should be considered experimental.
 
 
 23
 Finally, the court did not clearly err in supporting its determination of the royalty rate with the finding that the potential royalty base of the competitors receiving the royalty offers was smaller than the royalty base in this case, which included all spacecraft costs and payload costs, and with the finding that there were acceptable non-infringing alternatives. Hughes' evidence and arguments are insufficient to overturn these findings. Furthermore, these findings were just two out of many that the court used to support its royalty rate determination and Hughes has failed to show that any error associated with these findings would be anything but harmless.
 
 
 24
 Because the Court of Federal Claims did not clearly err or abuse its discretion in its determination of a reasonable royalty rate, we affirm the 1% royalty rate.
 
 II.
 
 25
 A. The government argues that the interest rates arrived at by the Court of Federal Claims to calculate delay damages overcompensate Hughes for the delay in payment. The government characterizes the royalties owed Hughes as similar to a loan to the government which carries no risk. Under this view, the government argues that the delay damages should be calculated based on the rates paid on Treasury bills. The government criticizes the rates used by the court as improperly including a premium for risk that Hughes did not bear.
 
 
 26
 A court has discretion in determining the delay compensation rate. See Pitcairn, 547 F.2d at 1122, 192 USPQ at 622 ("The determination of a proper amount of delay compensation is a judicial function. The discharge of that function requires the exercise of judgment."). In Pitcairn, the Court of Claims approved the use of long-term corporate bond yields as a measure of delay damages because they indicate broad trends and relative levels of investment yields and reflect the amount that the patentee has lost. 547 F.2d at 1122, 1124, 192 USPQ at 622, 624. It then held in Tektronix that the 7.5% rate it found applicable for 1975 in Pitcairn "should be applied (from now on) to just compensation cases, without need of proof in the individual instance, unless and until it is affirmatively demonstrated that under the theory of the Pitcairn opinion the rate for years after 1975 should differ from [that rate]." 552 F.2d at 352, 193 USPQ at 394. The Pitcairn analysis was applied in Miller to determine that a rate of 8.5% would be appropriate in a land takings case for the years 1976 to 1979, 620 F.2d at 840, and in Bendix, to determine that the tax overpayment rates were appropriate for the period from January 1, 1980 to the date of judgment in that case, 676 F.2d at 615-16. The Court of Federal Claims did not abuse its discretion in adopting these rates for the applicable periods.
 
 
 27
 The government also argues that the methodology used by the court for calculating delay damages overcompensates Hughes by failing take into account the taxes Hughes would have paid in the years that royalty compensation was due. Expressing concerns about double taxation, the Supreme Court in Hanover Shoe v. United Shoe Mach. Corp., 392 U.S. 481, 503, 88 S.Ct. 2224, 2237, 20 L.Ed.2d 1231 (1968), held that courts do not have to reduce a damage award by the amount of taxes that would have to be paid. This court has applied that rationale in other cases, see Kalman v. Berlyn Corp., 914 F.2d 1473, 1482-83, 16 USPQ2d 1093, 1100 (Fed.Cir.1990), and it is equally applicable to delay damages.
 
 
 28
 In this case the Court of Federal Claims rejected the government's argument that damages should be reduced by prior years' taxes. It determined that such a reduction (1) had been rejected by the case law; (2) would be speculative due to Hughes' particular tax situation, including what actions Hughes might have taken to reduce such taxes in prior years; and (3) was not provided for by Congress in the tax overpayment provisions. The court did not abuse its discretion in reaching this conclusion.
 
 
 29
 Finally, the government challenges the court's award of compound rather than simple interest. It is well settled that the determination whether to award simple or compound interest is a matter largely within the discretion of the trial court. Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1555, 35 USPQ2d 1065, 1077 (Fed.Cir.1995) (in banc ); accord City of Milwaukee v. Cement Div. Nat'l Gypsum Co., --- U.S. ----, ----, 115 S.Ct. 2091, 2096, 132 L.Ed.2d 148 (1995) (stating that the allowance of prejudgment interest "rests very much in the discretion of the tribunal which has to pass upon the subject, whether it be a court or a jury" (quoting The Scotland, 118 U.S. 507, 518-19, 6 S.Ct. 1174, 1175-76, 30 L.Ed. 153 (1886))); Dynamics Corp. v. United States, 766 F.2d 518, 520, 226 USPQ 622, 623 (Fed.Cir.1985) (holding that prejudgment interest may include compound interest). The government has failed to establish that the court abused its discretion in fixing the delay damages.
 
 
 30
 B. The government argues that Hughes VII should not be the law of the case after this court's in banc decision in Pennwalt. Thus, it asserts that "store and execute" (S/E) spacecraft do not infringe the Williams patent and should not be included in the compensation base.
 
 
 31
 In Hughes VII, this court noted two differences between the S/E spacecraft and the claimed invention of the Williams patent that precluded a finding of literal infringement: (1) certain of the S/E spacecraft do not contain the means for providing an indication of instantaneous spin angle (ISA) to ground control required by paragraph (e) of claim 1; and (2) none of the S/E spacecraft contain the means for receiving control signals for immediate execution required by paragraphs (f) and (g) of Claim 1.[3] 717 F.2d at 1361, 219 USPQ at 480. This court held, however, that the S/E spacecraft infringed the Williams claims under the doctrine of equivalents. The Hughes VII opinion noted that the trial court's doctrine of equivalents analysis failed to apply the doctrine properly to the claimed invention and erred in requiring "obvious and exact equivalents" for claim limitations. Id. at 1364, 219 USPQ at 482. Based on the specification and engineering evidence, the court concluded that "retention of the ISA position in an on-board computer, while transmitting sufficient information to enable the ground crew to use that computer-retained information to control the satellite, is the modern-day equivalent of providing an indication of ISA to ground" as required by paragraph (e) of claim 1. Id. at 1365, 219 USPQ at 483. It also determined that the external synchronization of the command signal with the ISA position as specified in paragraphs (f) and (g) is equivalent to the internal synchronization accomplished onboard the S/E spacecraft by using modern memory circuits. Id., at 1366, 219 USPQ at 484. The court said that use of ISA information onboard as a reference point for firing the jet, instead of using the ISA information on the ground as a reference point, was merely a relocation in the function and did not change the function performed, the manner of operation, or the result obtained. Id. at 1366, 219 USPQ at 484.
 
 
 32
 Four years after Hughes VII, this court sitting in banc stated in Pennwalt that it was well settled under the doctrine of equivalents "that each element of a claim is material and essential, and that in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent." 833 F.2d at 935, 4 USPQ2d at 1739-40 (quoting Perkin-Elmer Corp. v. Westinghouse Elec. Corp., 822 F.2d 1528, 1523-33, 3 USPQ2d 1321, 1324-25 (Fed.Cir.1987)). The dissenting opinion in Pennwalt asserted that the majority was requiring the "obvious and exact equivalents" requirement that was rejected in Hughes VII. Id. at 941-42, 4 USPQ2d at 1744-45 (Bennett, S.J., dissenting).
 
 
 33
 The government now argues that Hughes VII is inconsistent with Pennwalt primarily on the basis of the views expressed in the dissenting opinion. We, of course, have the power to revisit the decision of the Hughes VII court. The Supreme Court has instructed, however, that this power of courts to revisit their own prior decisions should be sparingly exercised by stating that "as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.' " Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817, 108 S.Ct. 2166, 2178, 100 L.Ed.2d 811, 7 USPQ2d 1109, 1117 (1988) (quoting Arizona v. California, 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 1391 n.8, 75 L.Ed.2d 318 (1983)). The government has failed to show that any such circumstances exist.
 
 
 34
 In Hughes VII the court was faced with applying the doctrine of equivalents to a claim written in means plus function language, and thus had to apply the doctrine of equivalents to a claim which under 35 U.S.C. § 112, p 6, included the structure of the specification and equivalents. The court concluded in this instance that the trial court had required "obvious and exact equivalents" which made the doctrine of equivalents analysis the same as for literal infringement, and that the court had, therefore, erred as a matter of law in applying that doctrine. 717 F.2d at 1364, 219 USPQ at 482.
 
 
 35
 In Hughes VII, as discussed above, the court noted the similarities and the differences between the claimed invention and the S/E spacecraft and the fact that the teachings of Williams were used to develop the S/E spacecraft. Id. at 1365-66, 219 USPQ at 482-83. It then considered each claim limitation not literally found in the S/E spacecraft and looked at whether the elements of the S/E spacecraft performed the same function in substantially the same way to obtain the same result. Id. at 1365-66, 219 USPQ at 483-84. Because there was an equivalent for each claim limitation not literally met, Id. at 1365-66, 219 USPQ at 483-84, the court concluded that the differences between the claimed invention and the S/E spacecraft were too insubstantial to avoid liability under the doctrine of equivalents. See id. at 1365, 219 USPQ at 483 ("Advanced computers and digital communications techniques developed since Williams permit doing on-board a part of what Williams taught as done on the ground.... [A]n embellishment made possible by post-Williams technology, does not allow the accused spacecraft to escape the 'web of infringement.' " (quoting Bendix Corp. v. United States, 220 Ct.Cl. 507, 600 F.2d 1364, 1382, 204 USPQ 617, 631 (1979))).
 
 
 36
 This analysis in the court's prior decision is therefore entirely consistent with Pennwalt, as well as this court's more recent in banc decision in Hilton Davis v. Warner-Jenkinson Co., 62 F.3d 1512, 35 USPQ2d 1641 (Fed.Cir.1995), cert. granted, --- U.S. ----, 116 S.Ct. 1014, 134 L.Ed.2d 95 (1996). There is no indication in the majority opinion in Pennwalt that Hughes VII was being overruled or that it was inconsistent with Pennwalt. Moreover, one member of the majority expressly countered the assertion of inconsistency put forth by the dissent by stating that Hughes VII merely distinguished equivalency in a doctrine of equivalents analysis from equivalency of structure of disclosed means in a § 112, p 6 analysis. Id. at 949, 953, 4 USPQ2d at 1751, 1755 (Nies, J., additional views).
 
 
 37
 In Hilton Davis, we stated that the "application of the doctrine of equivalents rests on the substantiality of the differences between the claimed and accused products or processes, assessed according to an objective standard." 62 F.3d at 1518, 35 USPQ2d at 1645. We noted that the function/way/result test is properly used in many cases to measure the substantiality of the differences. Id. at 1518, 1522, 35 USPQ2d at 1645, 1648. Moreover, we stated that "the trial judge does not have discretion to choose whether to apply the doctrine of equivalents when the record shows no literal infringement" and may consider such evidence as copying. Id. at 1519, 35 USPQ2d at 1646. As described above, the Hughes VII court applied these very principles.
 
 
 38
 The dissent apparently would decide Hughes VII differently if the case were before this panel, arguing that the approach taken by the Hughes VII dissent is the approach required under current law. This is not, however, a sufficient justification to refuse to follow law of the case. There is little doubt that this was a close case and reasonable minds could differ on the proper outcome of Hughes VII. Indeed, one member of the Hughes VII court dissented. That this was a close case, however, counsels in favor of abiding by the law of the case. Christianson, 486 U.S. at 819, 108 S.Ct. at 2179, 100 L.Ed.2d 811, 7 USPQ2d at 1117 (" 'The doctrine of law of the case is ... a heavy deterrent to vacillation on arguable issues.' " (quoting 1B James W. Moore, et al., Moore's Federal Practice p 0.404 (1984))). Simply because a different panel might reach a different conclusion, does not mean that the earlier decision is "clearly erroneous." See id.
 
 
 39
 The dissent makes the further point that we should not consider the length of time this litigation has been pending and urges the court to stay the issuance of this decision until the Supreme Court decides Hilton Davis. Because no showing was made to justify staying the decision in this case, we should not ignore the fact that it has been ongoing for over twenty-three years. The "promptness of decision ... in all judicial actions is one of the elements of justice." Forsyth v. City of Hammond, 166 U.S. 506, 513, 17 S.Ct. 665, 668, 41 L.Ed. 1095 (1897). The litigants in this action deserve finality. Over such a long period of time, the composition of the panels of this court and the judge assigned to the case at the trial level has necessarily changed. As a matter of course, different judges looking at the same case may not view it in the same way. But under the law of the case, we must give respect and force to legal decisions rendered by earlier panels, absent a clear showing of error or injustice. Any other result would unduly prolong this already drawn-out litigation.
 
 CONCLUSION
 
 40
 The judgment of the Court of Federal Claims is affirmed for the reasons above set forth.
 
 
 41
 AFFIRMED.
 
 
 42
 BRYSON, Circuit Judge, concurring.
 
 
 43
 There is substantial force to Judge Nies's analysis of the doctrine of equivalents issue in this case. But while I agree with much of what she says, I cannot join the disposition that she proposes.
 
 
 44
 This court's law on the doctrine of equivalents has certainly evolved over time, and the first Hughes appeal comes from well back in this court's history. It may well be that if we were writing on a clean slate we would view the doctrine of equivalents issue in this case differently now than the court did at that time. Because the first Hughes appeal decided the equivalents issue, however, we are not free to address the issue de novo, as if the first appeal had not occurred or as if it were merely an interesting historical byway in the seemingly endless course of this litigation. The law-of-the-case doctrine counsels strongly against one panel's overturning an earlier panel's resolution of the same issue in the same case. Based on that doctrine, I join the opinion of the court in this case.
 
 
 45
 If the law-of-the-case doctrine is to have any substance, it must sometimes require a judge to uphold a ruling on a question that the judge would decide the other way if it were presented for the first time. In order to serve the interests of judicial economy, finality, and avoidance of "panel-shopping," the doctrine strongly discourages reconsideration of issues that a previous panel has addressed, fully considered, and decided. See Roberts v. Cooper, 61 U.S. 467, 481, 20 How. 467, 15 L.Ed. 969 (1857) ("there would be no end to a suit if every obstinate litigant could, by repeated appeals, compel a court to listen to criticisms on their opinions, or speculate of chances from changes in its members"); Central Soya Co. v. Geo. A. Hormel & Co., 723 F.2d 1573, 1580, 220 USPQ 490, 495 (Fed.Cir.1983). Moreover, in patent cases, where Congress has made special provision for interlocutory appeals, see 28 U.S.C. § 1292(c)(2), adherence to the law-of-the-case doctrine is especially important, as there are more opportunities for a party dissatisfied with a ruling from one panel to seek a different result from a second.
 
 
 46
 As a general matter, courts apply the law-of-the-case doctrine except when the case for departure is exceptionally clear, either because the controlling law has changed or the earlier decision is clearly erroneous and would lead to manifest injustice. See Mendenhall v. Barber-Greene Co., 26 F.3d 1573, 1582, 31 USPQ2d 1001, 1007 (Fed.Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 582, 130 L.Ed.2d 496 (1994); Perkin-Elmer Corp. v. Computervision Corp., 732 F.2d 888, 900, 221 USPQ 669, 679 (Fed.Cir.) (departures from the law of the case doctrine occur "very infrequently"; the clearly erroneous/manifest injustice exception is "stringent" and requires a "strong showing of clear error"), cert. denied, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984); see also Smith Intern., Inc. v. Hughes Tool Co., 759 F.2d 1572, 1576-80, 225 USPQ 889, 891-94 (Fed.Cir.), cert. denied, 474 U.S. 827, 106 S.Ct. 87, 88 L.Ed.2d 71 (1985). Whatever view I might take on the merits if the doctrine of equivalents issue in this case were before us for the first time, I do not think the prior disposition is so clearly erroneous or has so plainly been overtaken by subsequent developments that the law-of-the-case doctrine can be disregarded.
 
 
 47
 Judge Nies makes the separate point that, in light of the pendency of Hilton Davis Chemical Co. v. Warner-Jenkinson Co., Inc. in the Supreme Court, the wisest course for us would be to suspend resolution of this appeal until the Supreme Court decides that case. To bring this long-pending litigation to a close on the eve of what might be a dispositive resolution of the doctrine of equivalents issue, Judge Nies argues, would be injudicious.
 
 
 48
 If I felt that the panel's decision were the last stop on the voyage of this case, I might well agree with Judge Nies. But it is not the last stop. Besides seeking rehearing in this court, the government can petition for certiorari from the Supreme Court, with a request that the Court hold the case pending the disposition of Warner-Jenkinson. Thus, our decision today is not likely to deprive the government of the chance for a favorable judgment by stealing a march on the Supreme Court.
 
 
 49
 But why should we issue this decision if the result will simply be to put the government to the task of going through additional procedural steps to keep the judgment from becoming final while the government is waiting for the Supreme Court to decide Warner-Jenkinson? There are several reasons. First, we have a number of issues to resolve in addition to the doctrine of equivalents question. The panel is unanimous as to all but one of those issues. The resolution of the other issues may be useful in limiting the points on which the parties are in disagreement (it may be too much to hope that resolving some of the issues will provide a meaningful impetus to settlement in this case, but more information is usually better than less). In addition, we cannot realistically suspend the proceedings in every case that could potentially be affected by the Warner-Jenkinson decision, which may be as much as a year away. One of the unfortunate features of the doctrine of equivalents as it has developed over time is that it has come to play a crucial role in a large percentage of patent infringement actions. If we hold this case pending the Supreme Court's decision in Warner-Jenkinson, how could we justify not suspending the appeal in every case raising a plausible doctrine of equivalents claim that comes before this court over the next year? Finally, the government has not asked us to suspend this appeal, even though the Supreme Court granted certiorari in Warner-Jenkinson several months ago. I assume that if the government felt strongly that its rights were at risk if this court should choose to apply law-of-the-case principles without awaiting a Supreme Court decision, we would have heard from government counsel by now. Absent a request for suspension, I agree that we should treat this case as we treat all others and decide it as soon as a disposition is ready, leaving the parties to protect their interests, if they choose, through the avenues of further review.
 
 
 50
 NIES, Senior Circuit Judge, dissenting.
 
 I.
 
 51
 This appeal raises a novel question respecting the application of principles of "law of the case." In 1983, this court reversed a judgment of the United States Claims Court, Hughes Aircraft Co. v. United States, 215 USPQ 787 (Cl.Ct.1982) (Hughes VI ) that certain store and execute (S/E) satellites did not infringe the claims of Hughes' U.S. Patent No. 3,758,051 (the '051 patent) under the doctrine of equivalents and remanded the case for a determination of damages. Hughes Aircraft Co. v. United States, 717 F.2d 1351, 219 USPQ 473 (Fed.Cir.1983) (Hughes VII). Upon remand, Hughes asserted that an additional 94 spacecraft, differing in various ways from those that had been litigated, also used the '051 invention. Subsequent lengthy trial court proceedings resolved the issues of liability respecting these devices. The judgment now before us fixes the amount of compensation due under 28 U.S.C. § 1498.
 
 II.
 
 52
 Hughes VII was one of the first cases of this court to present the issue of infringement under the doctrine of equivalents and resulted in a split decision. Some understanding of the technology and of the different views of the panel is helpful at this point. The '051 patent is directed to a system for control of a spin-stabilized communications satellite. The patent explains that communications over long distances are possible if the satellite is accurately placed and maintained in a "geosynchronous" orbit. In such an orbit, the position of the satellite and its velocity are such that the satellite appears to hover over one point on the Earth's surface. Accurate placement and maintenance of the geosynchronous orbit maximizes communications potential.
 
 
 53
 The importance of satellite placement gives rise to the need to correct for satellite drift. Williams teaches countering satellite drift in real-time by intermittently pulsing attitude control jet valves, which are located on the periphery of the satellite, thereby tilting or "precessing" the satellite. A radio transmitter on the satellite sends instantaneous spin angle (ISA) position and orientation information to a ground crew on Earth. Once the satellite's existing and desired orientations are determined, the ground crew transmits control signals to the satellite which are synchronized with the spin position and orientation. In response, the control valves are immediately pulsed, precessing the satellite into position.
 
 
 54
 Claim 1 which is representative of the claims in suit requires (a) a body adopted to spin about an axis; (b) a fluid supply; (c) a valve connected to the fluid supply; (d) fluid expulsion means oriented to expel fluid, and the following additional elements:
 
 
 55
 (e) means disposed on said body for providing an indication to a location external to said body of the instantaneous spin angle position of said body about said axis and the orientation of said axis with reference to a fixed external coordinate system;
 
 
 56
 (f) and means disposed on said body for receiving from said location control signals synchronized with said indication;
 
 
 57
 (g) said valve being coupled to said last-named means and responsive to said control signals for applying fluid to said fluid expulsion means in synchronism therewith for precessing said body to orient said axis in a predetermined desired relationship with said fixed external coordinate system.
 
 
 58
 The government spacecraft in issue do not send information to the ground crew and are not precessed upon a signal sent by the ground crew but are controlled by a stored program in an on-board computer, i.e., a store and execute system (S/E).
 
 
 59
 The majority, nevertheless, concluded that S/E spacecraft infringe because:
 
 
 60
 The failure to apply the doctrine of equivalents to the claimed invention as a whole, and the accompanying demand for "obvious and exact" equivalents of two elements the presence of which would have effectively produced literal infringement, was error.
 
 
 61
 ....
 
 
 62
 [T]he S/E spacecraft, with the ISA position indication retained on-board, are equivalents of Williams' claimed satellite, with the ISA position indication sent to ground, performance of the function involving the ISA position being substantially the same in each. We agree.
 
 
 63
 ....
 
 
 64
 The S/E spacecraft uses sun pulses retained on-board as reference points to fire the jet. Williams uses sun pulses sent to ground as reference points to fire the jet. The difference between operation by retention and operation by sending is achieved by relocating the function, making no change in the function performed, or in the basic manner of operation, or in the result obtained.
 
 
 65
 ....
 
 
 66
 The S/E spacecraft and the claimed Williams satellite reflect the precise circumstance envisaged in Graver, supra, for they perform the same function (receipt of and response to command signals from an external location to accomplish precession), in substantially the same way (jet firings synchronized, albeit later and internally, with ISA position) to obtain substantially the same result (controlled precession of spin axis in a predetermined direction to orient a hovering satellite).[1]
 
 
 67
 717 F.2d at 1364-66, 219 USPQ at 482-484.
 
 
 68
 One panel member, Judge Davis, agreed with the trial court that one or more elements required by the claims was not present in the accused S/E satellites, either exactly or by an equivalent thereof. More particularly, he would have affirmed the trial court's finding, inter alia, that the accused devices had no equivalent for the required "means ... providing an indication" of the ISA "to an external location."[2] The claims expressly call for an attitude control system, a structure, on the spinning body which sends information on the ISA to a ground controller, who determines when a jet should be fired based in part on the ISA information. Judge Davis concluded:To find, as the majority does, in this self-contained on-board computer an equivalent of the specific requirement for providing an indication of ISA to the ground (so that the ground can take account of ISA) is simply to obliterate and disregard this element of the claims. These accused structures may possibly obtain "the same result" as Williams but they do not perform "the same function" in "the same way" either literally or substantially. Whether or not this on-board device for calculation would be unobvious--and there is no finding and (to my mind) no showing that it would have been obvious--its substitution was not a proper equivalent for infringement of this non-pioneer patent because the wholly on-board computer device operated in a different way to perform the different function of a significant calculation unrelated to ground personnel.[3]Unlike the Court of Claims decisions cited in the court's opinion this is not the case of a "sophisticated" technique of performing the same function in the same way. It is a "sophisticated" method of performing a different function in a different way. Even if the standard of "obvious and exact equivalents" (Eastern Rotorcraft Corp. v. United States, 397 F.2d 978, 982, 184 Ct.Cl. 709, 158 USPQ 294 (1968)) is considered as too narrow, the accused devices here are definitely outside the equivalence principle of Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950).
 
 
 69
 717 F.2d at 1367, 219 USPQ at 485.
 
 
 70
 The government argues in its brief and at the hearing that the Hughes VI finding of noninfringement by S/E satellites would be affirmed under the precedent of Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 4 USPQ2d 1737 (Fed.Cir.1987) (in banc ), cert. denied, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426, 485 U.S. 1009, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988), and its progeny; and that it should not be held liable for infringement of the '051 patent for acts which would not constitute infringement by anyone else. Further it urges that this court must apply the law of Hilton Davis Chemical Co. v. Warner-Jenkinson Co., 62 F.3d 1512 (Fed.Cir.1995) (in banc ), cert. granted, --- U.S. ----, 116 S.Ct. 1014, 134 L.Ed.2d 95 (1996), an in banc case on the doctrine of equivalents then pending, whatever the holding might be. Hughes counters that Hughes VII is not in conflict with Pennwalt and that, in any event, this court should not revisit liability issues after these many years even if the law in the Hughes VII decision is wrong. In addition, Hughes argues that the government waived its right to reargue that its S/E satellites do not use the '051 invention because the government did not argue below that the law had changed. Respecting Hilton Davis, Hughes argues that it would be manifestly unjust to apply retroactively any new test that might be adopted therein.
 
 III.
 
 71
 Unlike res judicata, the law of the case does not involve preclusion after final judgment, but rather it regulates judicial affairs before final judgment. 18 CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 4478 (1981). A court will not generally revisit an issue once decided during the course of litigation. "Although courts are often eager to avoid reconsideration of questions once decided in the same proceeding, it is clear that all federal courts retain power to reconsider if they wish." Id. As Justice Holmes stated, the law of the case doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." Messenger v. Anderson, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912). The Supreme Court has also explained that "there is a difference between [law of the case] and res judicata; one directs discretion, the other supersedes it and compels judgment." Southern Ry. Co. v. Clift, 260 U.S. 316, 319, 43 S.Ct. 126, 127, 67 L.Ed. 283 (1922). See also Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983). Thus, Hughes is correct that a court has some discretion under "law of the case" principles. However, the federal courts of appeals have uniformly recognized that an intervening change in applicable law is a strong basis for reconsideration of a decided issue in a pending case. Dean v. Trans World Airlines, Inc., 924 F.2d 805, 810 (9th Cir.1991) (Supreme Court decision changed applicable law); Miles v. Kohli & Kaliher Associates, Ltd., 917 F.2d 235, 242 (6th Cir.1990) (state Supreme Court decision changed applicable law in diversity case); Doe v. Anrig, 728 F.2d 30, 31 (1st Cir.1984) (decision by the same court of appeals changed applicable law); Wooster v. Handy, 21 F. 51, 53-54 (C.C.S.D.N.Y.1884) (decree of patent validity reconsidered after Supreme Court decisions relating to the validity of reissued patents).
 
 A.
 
 72
 As an initial matter, Hughes' argument is clearly untenable that the government has "waived" its right to argue for application of the current law at this stage of the proceedings. The government conceded only that, under our prior Hughes decision, certain additional S/E satellites could not be distinguished from the ones already found to be infringing. Nor could the government appropriately argue to the trial court that it did not have to follow the explicit mandate of this court during the course of the later damages phase because of a change in the law. The trial court must follow the appellate court mandate until the appellate court itself changes it. In re Roberts, 846 F.2d 1360, 1363, 6 USPQ2d 1772, 1774 (Fed.Cir.1988) ("Unlike the authority to reconsider its own rulings, a district court is without choice in obeying the mandate of the appellate court."). However, at all times, the government expressly preserved the S/E infringement issue for appeal, and Hughes does not challenge the right of the government to petition the Supreme Court for review of all infringement issues. Finality of decision has not been achieved for purposes of further appeal until the majority decision today. Hughes simply argues for our adherence to the law of the case.
 
 
 73
 There can be no question that the Supreme Court would apply the current law to a pending case. See, e.g., United States Surgical Corp. v. Ethicon, --- U.S. ----, 116 S.Ct. 1562, 134 L.Ed.2d 662 (1996) (remanding case to apply ruling in Markman v. Westview Instruments, Inc., 517 U.S. ----, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) to case decided prior thereto). Therefore, it makes no sense to hold that this court should not apply current precedent to correct its decision in a pending case. If the law applied in Hughes VII is no longer the law in this circuit, this court has an obligation, under the principles of law of the case, to revisit that issue if failure to do so would work a manifest injustice.
 
 B.
 
 74
 Nor should the passage of time work against the government's position. While Hughes VII was decided 14 years ago, the delay in the presentation of the issue of "law of the case" has not been due to the government's procrastination. Hughes's assertion that additional spacecraft infringed required extensive trials on disparate issues, e.g., whether some were held covered by a release to the manufacturer which they were. The government has not merely been "hoping that the passage of time or change in the composition of the court will provide a more favorable result the second time," as in a case cited by Hughes, United States v. Turtle Mountain Band of Chippewa Indians, 222 Ct.Cl. 1, 612 F.2d 517, 520 (1979). In that case the government sought reconsideration of an issue fully argued and rejected before. Hughes ellipses from the quotation, "No litigant deserves an opportunity to go over the same ground twice, hoping ... [for a change in the court's view]." Here, the government argues that the law has been changed in other cases since the first decision.
 
 IV.
 
 75
 It would be surprising, indeed, if no development of the law of infringement had occurred over the 14 years since Hughes VII, and one would have to bury one's head in the sand to hold it has not. Not only has the test for infringement been restated and refined as in the "All Elements rule" stated in Pennwalt, the rejection of functional equivalency as the test for infringement in Atlanta Motoring Accessories, Inc. v. Saratoga Technologies, Inc., 33 F.3d 1362, 1366 (Fed.Cir.1994), and the "insubstantial change rule" set forth in Hilton Davis, discussed infra, but also the correct standards of review of a judgment of infringement were also later articulated for the first time.
 
 
 76
 Hughes argues that only an outright reversal of the substantive law applied in reaching a decision warrants departure from "law of the case." I find no controlling authority so holding. If the law has evolved to such an extent that the result in the case would be different, law of the case principles do not require blind adherence to a wrong result. Conversely, if the result would be the same under current precedent, any error in a prior opinion would be harmless. This brings us to the question of what disposition should be made in this case of the S/E infringement issues.
 
 
 77
 The dissent in Hughes VII made the type of analysis which must be made under current case law. The actual structure of the specified components of the invention and of the accused devices was considered by the dissenter, not merely the overall equivalency or even the "equivalent" functions of the substituents, to which the majority limited its analysis. Atlanta Motoring, 33 F.3d at 1365-66 (merely functional equivalents not enough for infringement under doctrine); Johnston v. IVAC Corp., 885 F.2d 1574, 1580, 12 USPQ2d 1382, 1387 (Fed.Cir.1989) (structual equivalency of "means" element required under § 112 p 6). Further, the majority essentially performed a de novo review of the facts and law. The majority held no factual finding of the trial court clearly erroneous respecting the nonequivalency of the accused components, Insta-Foam Prods., Inc. v. Universal Foam Sys., Inc., 906 F.2d 698, 702 (Fed.Cir.1990) (determination of equivalent elements under the doctrine is a question of fact reviewed under clearly erroneous standard); it also did not remand for new factual findings after holding that the trial court erred "as a matter of law," Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561, 1565, 1 USPQ2d 1593, 1595 (Fed.Cir.1987) (in view of legal error, appellate court should remand for trial court to make the missing findings); and it either ruled on equivalency as a matter of law contrary to Hilton Davis, 62 F.3d at 1522, 35 USPQ 2d at 1648 (finding of infringement under the doctrine of equivalents reviewed as a question of fact; not legal or equitable issue) or it substituted findings of its own that the different control system of the accused satellites was equivalent contrary to Atlantic Thermoplastics Co. v. Faytex Corp., 5 F.3d 1477 (Fed.Cir.1993) ("fact-finding by the appellate court is simply not permitted"). Either way, the majority's free wheeling "review" was not in accord with the appellate standards now followed by this court.
 
 V.
 
 78
 This court handed down a plethora of opinions in Hilton Davis. The majority says it merely "restated" the law by returning the doctrine to the original moorings of Graver Tank that only insubstantial changes from the claim fall within the doctrine. Three dissenting opinions and one concurrence were filed setting out widely divergent views of the law.
 
 
 79
 The Supreme Court has recently taken Hilton Davis for review, its first case on the doctrine of equivalents under the Patent Act of 1952. The petitioner therein urges that literal infringement (which includes equivalents only under 35 U.S.C. § 112 p 6) should be the sole basis for liability and that the judicially created doctrine of equivalents should be abandoned because it is inconsistent with the current statute. Petitioner argues further that the test for nonliteral infringement set forth in Hilton Davis, directed to the "insubstantiality of the differences" from the claimed invention, deprives the public of notice of patent boundaries, offers protection not approved by the PTO, and overrides the statutory reissue provisions. Brief of Petitioner Warner-Jenkinson, pp. 13-27. Petitioner urges the Court, at most, to recognize nonliteral infringement only where known equivalents are disclosed in the patent application, the situation in Graver Tank. Brief of Petitioner Warner-Jenkinson, at 38-41.
 
 
 80
 The Supreme Court's rulings on these issues can be expected to have a major impact on the law of infringement. I conclude that the majority opinion in Hughes VII conflicts not merely with the dissents in Hilton Davis, but with the majority as well. I would, therefore, suspend this appeal pending the Supreme Court's decision in Hilton Davis.[3] A few months of delay is insignificant in a suit of this magnitude which has been pending since 1973. In my view, it would be a manifest injustice to the people of the United States to end this case and approve the payment of millions of dollars in compensation to Hughes when the law imposing liability is in a state of such uncertainty.
 
 
 
 *
 Judge Nies assumed senior status on November 1, 1995
 
 
 [1]
 During this litigation twelve prior opinions have issued. The first eight reported decisions are listed in Hughes Aircraft Co. v. United States, 15 Cl.Ct. 550, 551 n. 2, 8 USPQ2d 1989, 1990 n. 2 (1988) (Hughes IX ), and the tenth through twelfth are referenced in Hughes XII, 31 Fed. Cl. at 483 n. 2, 35 USPQ2d at 1244 n. 2. This ordering is used herein to number the Hughes opinions cited repeatedly. Two other decisions involving the Williams patent are listed in Hughes IX, 15 Cl.Ct. at 551 n. 2, 8 USPQ2d at 1990 n. 2
 
 
 [2]
 The McLean patent (United States Patent No. 3,216,674) was the first to disclose the basic concept of pulsing a jet to correct the spin axis of a satellite, and the government had a non-exclusive license to use it
 
 
 [3]
 These paragraphs of claim 1 read as follows:
 e. means disposed on said body for providing an indication to a location external to said body of the instantaneous spin angle position of said body about said axis and the orientation of said axis with reference to a fixed external coordinate system;
 f. and means disposed on said body for receiving from said location control signals synchronized with said indication;
 g. said valve being coupled to said last-named means and responsive to said control signals for applying fluid to said fluid expulsion means in synchronism therewith for precessing said body to orient said axis in a predetermined desired relationship with said fixed external coordinate system.
 See Hughes VII, 717 F.2d at 1355, 219 USPQ at 475-76, for the entire claim 1.
 
 
 [1]
 I note that the damage award is based on hovering and non-hovering government spacecraft. It is not disputed that most of the accused satellites are operated in non-geosynchronous orbits, i.e., the satellites and the Earth move at different angular velocities, and therefore, unlike Williams' satellite, do not have to account for the propagation delay in transmitting the control signals between the satellite and Earth. The majority's finding of infringement did not, however, distinguish between hovering and non-hovering satellites
 
 
 [2]
 Judge Davis also concluded respecting other elements:
 
 
 [3]
 The same is true of the elements specifying the method for controlling the precession jet. In this regard, Williams, again as Judge Colaianni points out, limits its claims so as to require a ground controller, not only to determine the ISA, but also to use the ISA to pulse the precession jet during the desired portion of the spin cycle. As to the latter, the claims in suit also require means for pulsing the precession jet within a fixed time period after the receipt of the control signal. This does not occur in any of the accused structures, nor does the ground location use ISA to determine the execute command
 .... Moreover, in Williams there must be a fixed time period between the receipt by the spacecraft of a control signal and the activation of the precession jet. In the S/E satellites, in contrast, neither the ground nor the execute signal operates to activate the precession jet within a fixed time period (instead, that period varies). The sum of it is that the S/E structures perform a "different function" in a "different way" from those claimed by Williams--and are therefore not within the Graver principle.
 717 F.2d at 1367-68, 219 USPQ at 485-86.
 
 
 [3]
 The majority quotes Hughes' expert as testifying that it would have been obvious to place the calculating device on the spacecraft but the Government's witnesses testified that this device was not an equivalent
 
 
 [3]
 Contrary to statements by my colleagues, I do not advocate suspending other pending doctrine of equivalent cases. Such cases should be decided in accordance with principles set forth in this court's majority decision in Hilton Davis. Hughes VII does not meet that test and raises the important issue of whether a substituent in the combination must have been a known equivalent. Without analysis, Hughes VII holds that later developed technology can be an infringing equivalent contrary to Supreme Court precedent, see e.g., Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 13, 67 S.Ct. 6, 12, 91 L.Ed. 3 (1946)